HYNES, REGIONAL DIRECTOR, FISH AND WILD-
LIFE SERVICE, DEPARTMENT OF THE INTE-
RIOR, *v.* GRIMES PACKING CO. ET AL.

No. 24.   Argued October 21, 1948.—Decided May 31, 1949.

*Roger P. Marquis* argued the cause for petitioner. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Vanech, Stanley M. Silverberg* and *S. Billingsley Hill.*

*Frank L. Mechem* and *W. C. Arnold* argued the cause for respondents. With them on the brief was *Edward F. Medley. Charles A. Horsky* was also of counsel for respondents.

*Felix S. Cohen, James E. Curry* and *Henry Cohen* filed a brief on behalf of the Native Village of Karluk et al., as *amici curiae,* urging reversal.

MR. JUSTICE REED delivered the opinion of the Court.

The Secretary of the Interior on May 22, 1943, issued Public Land Order 128. It is set out in full below.[1] In this case the significant part of No. 128 is that the Secretary included in the reservation, by paragraph 2, adjacent tidelands and coastal waters along the entire shore line of the uplands that touched Shelikof Str. it between Kodiak Island and the Alaska Peninsula. The authority of the Secretary to utilize presidential power in the designation of this reservation out of public lands in Alaska flows from a delegation to the Secretary of presidential power to withdraw or reserve public lands and revoke or

---

[1] 8 Fed. Reg. 8557:

"ALASKA

"MODIFICATION OF EXECUTIVE ORDER DESIGNATING LANDS AS INDIAN RESERVATION

"By virtue of the authority contained in the act of June 25, 1910, c. 421, 36 Stat. 847, as amended by the act of August 24, 1912, c. 369, 37 Stat. 497 (U. S. C., title 43, secs. 141–143), and the act of May 1, 1936, c. 254, 49 Stat. 1250 (U. S. C., title 48, sec. 358a),

modify prior reservations. Executive Order No. 9146, of April 24, 1942, 1 C. F. R., Cum. Supp. 1149. The presidential power over reservations is made specific by the Act of June 25, 1910.[2] Another statutory provision, however, is the principal basis for Order 128. This is

and pursuant to Executive Order No. 9146 of April 24, 1942: *It is ordered,* As follows:

"1. Executive Order No. 8344 of February 10, 1940, withdrawing Kodiak and other islands, Alaska, for classification and in aid of legislation, is hereby modified to the extent necessary to permit the designation as an Indian reservation of the following-described area:

"Beginning at the end of a point of land on the shore of Shelikof Strait on Kodiak Island, said point being about one and one-quarter miles east of Rocky Point and in approximate latitude 57°39'40'' N., longitude 154°12'20'' W.;

"Thence south approximately eight miles to latitude 57°32'30'' N.;

"Thence west approximately twelve and one-half miles to the confluence of the north shore of Sturgeon River with the east shore of Shelikof Strait;

"Thence northeasterly following the easterly shore of Shelikof Strait to the place of beginning, containing approximately 35,200 acres.

"2. The area described above and the waters adjacent thereto extending 3,000 feet from the shore line at mean low tide, are hereby designated as an Indian reservation for the use and benefit of the native inhabitants of the native village of Karluk, Alaska, and vicinity: *Provided,* That such designation shall be effective only upon its approval by the vote of the Indian and Eskimo residents of the area involved in accordance with section 2 of the act of May 1, 1936, *supra: And provided further,* That nothing herein contained shall affect any valid existing claim or right under the laws of the United States within the purview of that section."

[2] The first section reads as follows, 36 Stat. 847:

"That the President may, at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States including the District of Alaska and reserve the same for water-power sites, irrigation, classification of lands, or other public purposes to be specified in the orders of withdrawals, and such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress."

There is a second section designed to keep the reservations free for mineral exploration and utilization.

§ 2 of the Act of May 1, 1936, 49 Stat. 1250. This act was passed to extend to Alaska the benefits of the Wheeler-Howard Act of June 18, 1934, 48 Stat. 984, and to provide for the designation of Indian reservations in Alaska. As § 2 is important in our discussion, the pertinent provisions are set out in full:

> "SEC. 2. That the Secretary of the Interior is hereby authorized to designate as an Indian reservation any area of land which has been reserved for the use and occupancy of Indians or Eskimos by section 8 of the Act of May 17, 1884 (23 Stat. 26), or by section 14 or section 15 of the Act of March 3, 1891 (26 Stat. 1101), or which has been heretofore reserved under any executive order and placed under the jurisdiction of the Department of the Interior or any bureau thereof, together with additional public lands adjacent thereto, within the Territory of Alaska, or any other public lands which are actually occupied by Indians or Eskimos within said Territory: *Provided*, That the designation by the Secretary of the Interior of any such area of land as a reservation shall be effective only upon its approval by the vote, by secret ballot, of a majority of the Indian or Eskimo residents thereof who vote at a special election duly called by the Secretary of the Interior upon thirty days' notice. . . ."

The Native Village of Karluk held a meeting on May 23, 1944, and accepted "the proposed Indian Reservation for this village. The adoption of said Reservation passed by a vote of 46 for and 0 against. 11 of the eligible voters were absent." See note 26, *infra*. Under § 19 of the Wheeler-Howard Act the Alaskan aborigines are classified as Indians.

On March 22 and August 27, 1946, the Secretary of the Interior amended the Alaska Fisheries General Regu-

lations, 50 C. F. R., 1946 Supp., § 208.23, that related to the commercial fishing for salmon in the Kodiak Area Fisheries by the addition of a subsection (r), reading as follows:

"(r) All waters within 3,000 feet of the shores of Karluk Reservation (Public Land Order No. 128, May 22, 1943), beginning at a point on the east shore of Shelikof Strait, on Kodiak Island, latitude 57°32'30'' N., thence northeasterly along said shore to a point 57°39'40''.

"The foregoing prohibition shall not apply to fishing by natives in possession of said reservation, nor to fishing by other persons under authority granted by said natives (49 Stat. 1250; 48 U. S. C. 358a). Such authority shall be granted only by or pursuant to ordinance of the Native Village of Karluk, approved by the Secretary of the Interior or his duly authorized representative." 11 Fed. Reg. 3105, 9528.

The authority for the regulation is given as 34 Stat. 263 and 478, as amended by the Act of June 6, 1924, 43 Stat. 464, an Act for the protection of the fisheries of Alaska, known as the White Act.[3] As the controlling section of this statute also is important, it is set out here,[4] 44 Stat. 752:

"SECTION 1. That for the purpose of protecting and conserving the fisheries of the United States in all waters of Alaska the Secretary of Commerce from time to time may set apart and reserve fishing areas in any of the waters of Alaska over which the United

---

[3] There is an amendment, immaterial here, see 44 Stat. 752.

[4] Under Reorganization Plan No. II the authority of the Department of Commerce over the administration of the White Act was transferred to the Department of the Interior, effective July 1, 1939. 53 Stat. 1431, § 4 (e).

States has jurisdiction, and within such areas may establish closed seasons during which fishing may be limited or prohibited as he may prescribe. Under this authority to limit fishing in any area so set apart and reserved the Secretary may (a) fix the size and character of nets, boats, traps, or other gear and appliances to be used therein; (b) limit the catch of fish to be taken from any area; (c) make such regulations as to time, means, methods, and extent of fishing as he may deem advisable. From and after the creation of any such fishing area and during the time fishing is prohibited therein it shall be unlawful to fish therein or to operate therein any boat, seine, trap, or other gear or apparatus for the purpose of taking fish; and from and after the creation of any such fishing area in which limited fishing is permitted such fishing shall be carried on only during the time, in the manner, to the extent, and in conformity with such rules and regulations as the Secretary prescribes under the authority herein given: *Provided,* That every such regulation made by the Secretary of Commerce shall be of general application within the particular area to which it applies, and that no exclusive or several right of fishery shall be granted therein, nor shall any citizen of the United States be denied the right to take, prepare, cure, or preserve fish or shellfish in any area of the waters of Alaska where fishing is permitted by the Secretary of Commerce. . . ." (See for definition of "several," 2 Bl. Com. 39–40.)

These are the statutes and orders that created the situation that led to this litigation.

The issuance of the White Act regulation of March 22, 1946, brought concern to the commercial fishing interests of Alaska. This was because of its drastic penalties. See note 49, *infra.* The native village of Karluk

spoken of in Order No. 128 establishing the reservation is
situated on the Karluk River, long recognized as one of
the most important salmon spawning streams of Alaska.
The natives live at its mouth on Shelikof Strait. There
the salmon must congregate from the Strait to enter
the channel of the river leading to their spawning grounds
in the interior of Kodiak Island. The waters included
in the reservation are those stretching eight miles along
the coast north and south of the mouth, 3,000 feet into
the Strait. Thus the best of the Karluk salmon fishery
is put into the reservation by Order No. 128.[5] For an
understanding of the locality, a sketch map is appended.

The importance of the Karluk fishery will be appreci-
ated by reference to a few of the facts in connection with
ъ. When Russia ceded Alaska to the United States in
1867, 15 Stat. 539, Karluk was already well known as
an abundant salmon fishery.[6] By 1885 the salmon can-
neries were flourishing and Bancroft reports the Karluk
pack at 36,000 cases out of a total of 65,000.[7] The pro-
duction continued large.[8] The red salmon was most
prolific. There were variations in the catch but it was

---

[5] The river itself and all waters within 100 yards of its mouth
are closed to all commercial salmon fishing. 50 C. F. R., 1946 Supp.,
§ 208.23 (d).

[6] Bancroft, History of Alaska, 1730–1885, p. 228, n. 12.

[7] Id., p. 743.

[8] H. R. Misc. Doc. No. 211, 51st Cong., 1st Sess., Report on the
Salmon and Salmon Rivers of Alaska, p. 20:
"The number of salmon actually caught in Karluk Bay, near the
river mouth and in the lower portion of the river, is so large as
to make a true statement concerning them seem incredible. In
1888 the canneries put up over 200,000 cases, averaging about 13
red salmon to the case, or more than 2,500,000 fish. In 1889 the
number of fish put up was still larger, reaching probably 250,000
cases, containing more than 3,000,000 salmon. As the number of
fish arriving at Karluk Bay for a long period of years has been
known to be far greater than in any of the other bays of southern

U. S. Commission of Fish and Fisheries,
M. McDonald. Commissioner.

CHART OF THE

# KADIAK GROUP OF ISLANDS
## ALASKA

TO ACCOMPANY REPORT
ON THE
## SALMON FISHERIES.

Shaw I.

C. Douglas

Ushugat I.

Amatuli I.

BARREN IDS.

Sea Otter Ids.

Point Banks

Chuyak I.

Sea Otter I.

Chuyak Strait

C. Current

Kiukhpalik I.

C. Chiniak

Black Cape

Torski Cape

Sea Lion Rocks

Halib Bay

C. Nukhshak

Paramanoff B.

C. St. Hermogenes

Marmot I.

C. Paramanoff

A F O G N A K  L.

Steep Cape

Ujat Bay

Pillar Cape

Kizhak Bay

C. Kuliak

Raspberry I.

S H E L I K O F F   S T R A I T

Takhli I.

Northern Str.

MARMOT BAY

Katmai Bay

C. Uganuk

Spruce I.

C. Ubugakhli

C. Ugat

Noisy I.

Uganuk I.

Narrow Str.

Williams Reef

C. Kuliuyonuit

Usernik Bay

St. Paul

St. Paul Hbr.

Kadiak Reef

C. Kaharnoi

C. Uyak

CHINIAK

Humpback Rock

UYAK BAY

BAY

C. Greville

C. Karluk

Karluk R.

K A D I A K

Ugak Bay

Low Cape

St. Orlovak

Ugak I.

Seal Rocks

Kiliuda Bay

C. Ikalik

Dangerous Cape

A L B A T R O S S   B A N K

Ayakulik I.

Ayakulik R.

Sitkalidak Strait

3 Saints Bay

Olga Bay

Sitkalidak I.

C. Barnabas

Sitkalidak

Black Pt.

Low Cape

C. Alitak

ALITAK BAY

Alsentia I.

Two Headed Cape

Alsentia Bay

C. Trinity

Russian Hbr.

Geese Ids.

Sikhinak I.

Tugidak

TRINITY ISLANDS

U. S. GOVERNMENT PRINTING OFFICE: 1948 O - 800399

always valuable.[9] In later years, the fluctuations continued and other varieties increased relatively.[10]

None of the respondent companies have packing plants at Karluk. All are, however, on Kodiak Island, which is around 100 miles long and 50 broad, and within fishing distance of the reservation waters. There is a fish refrigeration plant on the river. These canners have canned fish from these waters for from seven to twenty-four years. The percentage of each canner's pack that comes from the reserved waters is so large that the trial court found irreparable injury to the packers if they could not obtain the catch of the reservation. ". . . no other replacement source of such salmon for their canneries

Alaska, it is probable that most of these salmon were present at Karluk for the purpose of ascending the river to spawn. Now the number of spawning fish seen in the river, the lakes, and their connecting rivers was comparatively very small, indeed out of all proportion to the number taken on the beach."

[9] The highest reported by the Statistical Review of the Alaska Salmon Fisheries, June 13, 1930, Bureau of Fisheries Bulletin, vol. XLVI, p. 666, was nearly 4,000,000 fish in 1901 and the lowest about 400,000 in 1927. The report said:

"Many investigations of the Karluk red-salmon fishery have been made, much has been written about it, commercial interests have battled for exclusive control and domination of it, and dire prophecies have been heard concerning its ultimate destruction. Because of these things, Karluk has undoubtedly been given more close attention than any other fishery in Alaska. . . ."

[10] Unchallenged figures by plaintiffs show large catches. A table from the largest operator is printed for illustration.

"The total catch of fish taken within the area now included in the Karluk Indian Reservation during the years specified . . . :

| | Coho | Chum | Pink | King | Red | Total |
|---|---|---|---|---|---|---|
| 1941 | 1058 | 632 | 9893 | 134 | 59958 | 71675 |
| 1942 | 397 | 14556 | 225323 | 57 | 58042 | 298375 |
| 1943 | 83 | 825 | 2380 | 161 | 60273 | 63722 |
| 1944 | 33 | 5803 | 219300 | 69 | 63535 | 288740 |
| 1945 | 4 | 150 | 554 | 84 | 50907 | 51699 |
| 1946 | 137 | 8660 | 1024596 | 44 | 25381 | 1058818" |

on Kodiak Island is available to them." The canners' investment is substantial, running from two to five hundred thousand dollars respectively. The fishing is done by men who own their own three- to four-man boats, use similar company boats or operate under boat-buying contracts. Prices for the catch vary for these classifications. These packers employ over four hundred fishermen, chiefly residents of Alaska, and over six hundred cannery employees, chiefly nonresidents.

The fishing season at Karluk begins around June 1 and continues intermittently, depending upon the run of fish, until Sept. 30. After the issuance of § 208.23 (r) restricting the fishery at Karluk Reservation to Karluk natives and licensees, respondents brought this action against the Regional Director for the Territory of Alaska of the Fish and Wildlife Service to permanently enjoin the exclusion of their fishermen from the reservation on the ground that neither regulation § 208.23 (r) nor Public Land Order No. 128 legally closed the fishery of the coastal waters to respondents. The District Court granted the permanent injunction and held invalid both the regulation and the land order. 67 F. Supp. 43. On the same grounds the Court of Appeals for the Ninth Circuit affirmed the order for permanent injunction. 165 F. 2d 323.

## I.

(a) At the outset the United States contends that the Secretary of the Interior is an indispensable party who must be joined as a party defendant in order to give the District Court jurisdiction of this suit. In *Williams* v. *Fanning*, 332 U. S. 490, the test as to whether a superior official can be dispensed with as a party was stated to be whether "the decree which is entered will effectively grant the relief desired by expending itself on the subordinate official who is before the court." P. 494. Such

is the precise situation here. Nothing is required of the Secretary; he does not have to perform any act, either directly or indirectly. Respondents merely seek an injunction restraining petitioner from interfering with their fishing. No affirmative action is required of petitioner, and if he and his subordinates cease their interference, respondents have been accorded all the relief which they seek. The issues of the instant suit can be settled by a decree between these parties without having the Secretary of the Interior as a party to the litigation.

(b) Petitioner, Regional Director for the Territory of Alaska of the Fish and Wildlife Service of the Interior Department, is charged with the duty of enforcing the acts of Congress relating to the fisheries of Alaska and regulations issued thereunder. The District Court found that since March 22, 1946, the effective date of § 208.23 (r) of the Alaska Fisheries General Regulations, petitioner has continually threatened the seizure of all boats and equipment used to fish in the waters covered by this regulation to respondents' substantial and irreparable loss, and that the seasonal run of salmon in the reservation waters was essential for respondents' profitable operation. From the following facts it will be seen that there is sufficient evidence to support these findings.

After the promulgation of the fishery regulation, § 208.23 (r), the Warden for the Fish and Wildlife Service on Kodiak Island, one of petitioner's subordinate agents, repeatedly informed officials of the canneries that the regulation would be enforced and that the necessary steps would be taken to prosecute any violations. He communicated to the representatives of the canneries the contents of a telegram in which petitioner directed that a case to test the regulation be arranged for the opening day of the fishing season. The contents of this telegram were relayed to the headquarters in Seattle of the Alaska Salmon Industry, Inc., a trade association of the canned

salmon packers of which all but one of respondents are members. Thence the information was distributed to all interested parties. The Kodiak warden then reiterated to the cannery operators on that island his intention to enforce the regulation even though his force and equipment were inadequate for the purpose.

Thereafter two officers of the Indian Service were appointed special agents for the Fish and Wildlife Service to assist in the enforcement of the fishing regulations issued by the Interior Department. They arrived at Karluk June 24, 1946. These two deputies were armed and maintained a boat patrol in the waters of the reservation. They checked the names of boats fishing in the waters of the reservation against the permits issued by the village of Karluk. No boats were allowed inside the area which had been restricted for beach seining by vote of the Indian meeting of May 23, 1944,[11] and which was marked off by buoys.

If respondents show that they are without an adequate remedy at law and will suffer irreparable injury unless the enforcement of the alleged invalid regulation is restrained, a civil court will enjoin.[12] While ordinarily

---

[11] "Minutes of Meeting ·

"A meeting was called by the president and the same evening with Mr. Peters Mr. Watrous of Juneau and Mr. Leraas present. Following discussion and action:

"1. The problems of setting aside an area for beach seining were discussed. It was agreed that 1000 yd. from the mouth of the river up the spit and from the mouth of the river to Julia Fort point approximately 500 yd. on the Improvement side, placing markers or buoys 500 yd. out from mean low water mark be the restricted area for Karluk beach seining only. Purse seining could be done outside this restricted area this year or until further action by the council."

[12] See *Terrace* v. *Thompson*, 263 U. S. 197, 214; *Petroleum Exploration, Inc.* v. *Public Service Commission*, 304 U. S. 209, 217–19.

criminal prosecutions will not be restrained even under an invalid statute,[13] a civil action will lie in exceptional circumstances that make an injunction necessary to effectually protect property rights.[14]

The facts heretofore detailed as to the investments of respondents in canneries and fishing equipment and their established activities in the waters of the reservation make clear the serious effect on them of exclusion from the reservation. It is not a threat of a single prosecution, as in the *Spielman* case, but an ousting of respondents and their employees from the fishing grounds unless each individual person takes a fishing license. Under the findings the respondents could not operate profitably if prohibited from fishing in the reservation area. Many fishermen may stay away from the grounds for fear of punishment. In the pursuit of their otherwise lawful business respondents are threatened with criminal prosecution should they fish in the waters of the Karluk Reservation without a permit from the native village. For the violation of the applicable regulation under the White Act, severe penalties are imposed, including fine, imprisonment, the summary seizure of boats, haul, gear, equipment, and their forfeiture to the United States.[15] These sanctions deny to respondents an adequate remedy at law, for to challenge the regulation in an ordinary criminal proceeding is to hazard a loss against the payment of a license fee and compliance with the fishing rules of the natives. Yet to stay out of the reservation prevents the profitable operation of the canneries. In such a situa-

---

[13] *Watson* v. *Buck,* 313 U. S. 387; *Ex parte Sawyer,* 124 U. S. 200.

[14] *Parker* v. *Brown,* 317 U. S. 341; *Packard* v. *Banton,* 264 U. S. 140; *Truax* v. *Raich,* 239 U. S. 33; *Philadelphia Co.* v. *Stimson,* 223 U. S. 605, 620, Second. Cf. *Watson* v. *Buck,* 313 U. S. 387, 400; *Spielman Motor Sales Co.* v. *Dodge,* 295 U. S. 89; *Stainback* v. *Mo Hock Ke Lok Po,* 336 U. S. 368.

[15] 43 Stat. 466, 48 U. S. C. § 226.

tion a majority of the Court thinks that the "danger of irreparable loss is both great and immediate" and properly calls forth the jurisdiction of the court of equity.[16]

## II.

Respondents sought this injunction forbidding criminal proceedings aimed at excluding them from fishing in the coastal waters of Karluk Reservation on the ground that Public Land Order No. 128, note 1, *supra*, was invalid as a whole and particularly because of the inclusion of tidelands and coastal waters by § 2 of the order.

Respondents attack in their complaint the validity of the entire order because "no part of the land area involved had been withdrawn by Executive Order and placed under the jurisdiction of the Department of the Interior prior to May 1, 1936, as required by the Act of May 1, 1936." This position has not been pressed or decided.[17] The final order for an injunction against petitioner does not include any ruling on that point.

Nor do we think the authority of the Secretary of the Interior to establish the Karluk Reservation, Public Land Order 128, by virtue of the use and occupancy of the area by the natives under § 8 of the Act of May 17, 1884, 23 Stat. 26, or §§ 14 or 15 of the Act of March 3, 1891, 26 Stat. 1101, need be decided. While the point is referred to in the briefs, no such issue was tendered by the complaint; no such point was raised by the assignments of error; the question was specifically pretermitted by the opinion of the Court of Appeals, 165 F. 2d at 325; it is not included in the questions presented by the petition for

[16] *Parker* v. *Brown, supra,* 349. Seizure of a fisherman's boat is a drastic sanction. See Hearings before the Subcommittee on Alaskan Fisheries of the House Committee on Merchant Marine and Fisheries, 76th Cong., 1st Sess., pp. 45–47.

[17] 67 F. Supp. 43; 165 F. 2d 323.

certiorari and is not relied upon by the respondents to require affirmance of the Court of Appeals decree.

(a) The validity of Public Land Order 128 depends in this case on the scope of the power granted to the Secretary to establish this reservation by the language of § 2 of the Act of May 1, 1936, *supra*, authorizing the Secretary of the Interior to designate as a reservation "any other public lands which are actually occupied by Indians or Eskimos within said Territory." An administrative order is presumptively valid.[18]

In this instance, the Secretary acted under a statute, § 2, Act of May 1, 1936, and through delegation of presidential authority.[19] This delegation in turn rested on the Act of June 25, 1910, 36 Stat. 847.[20] This chain of delegated authority for the allocation of public lands in Alaska retains for future congressional action the power for the ultimate disposition of the property, land and water, within the boundaries of the reservation. Withdrawals under the Act of June 25, 1910, are "temporary" and "until revoked by him or by an Act of Congress."

The Wheeler-Howard Act of June 18, 1934, "To conserve and develop Indian lands and resources," which was extended to the Territory of Alaska by § 1 of the Act of May 1, 1936, authorized the Secretary of the Interior

---

[18] *Thompson* v. *Consolidated Gas Co.*, 300 U. S. 55, 69; *Pacific States Co.* v. *White*, 296 U. S. 176, 185; *Wampler* v. *Lecompte*, 282 U. S. 172, 175; *Martin* v. *Mott*, 12 Wheat. 19, 32.

[19] Executive Order 9146, 1 C. F. R., Cum. Supp., p. 1149:

"By virtue of the authority vested in me by the act of June 25, 1910, c. 421, 36 Stat. 847, and as President of the United States, I hereby authorize the Secretary of the Interior to sign all orders withdrawing or reserving public lands of the United States, and all orders revoking or modifying such orders: . . . ."

Executive Order 8344, 1 C. F. R., Cum. Supp., 618, referred to in Public Land Order 128, temporarily withdrew Kodiak Island from settlement, location, sale or entry for classification.

[20] So far as material that act is set out in note 2, *supra*.

to restore to tribal ownership only the remaining surplus lands of any Indian reservation theretofore opened for sale or other disposition.[21] It did not authorize the creation of reservations of any kind. Its only reference to acquisition of lands by or for Indians is in § 5 where appropriations are authorized for that purpose. This section is inapplicable here.

Section 2 of the extending act, set out at the beginning of this opinion, page 91, *supra,* gives no power to the Secretary to dispose finally of federal lands. By the new section he is authorized simply "to designate as an Indian reservation" any other public lands which are actually occupied by Indians or Eskimos within said Territory. There is no language in the various acts, in their legislative history, or in Land Order 128, from which an inference can be drawn that the Secretary has or has claimed power to convey any permanent title or right to the Indians in the lands or waters of Karluk Reservation. Rather the contrary is true. In the Act of May 14, 1898, 30 Stat. 409, 48 U. S. C. § 411, "Extending the homestead laws and providing for right of way for railroads in the District of Alaska, and for other purposes," there is the express proviso that nothing contained in the Act "shall be construed as impairing in any degree the title of any State that may hereafter be erected out of the Territory of Alaska, or any part thereof, to tide lands and beds of any of its navigable waters, or the right of such State

---

[21] It is unnecessary to appraise the effect of such restoration. Tribal ownership may vary from an unrecognized Indian title, see *Northwestern Bands of Shoshone Indians* v. *United States,* 324 U. S. 335, 338, 340, to land so set apart to an Indian tribe by definitive treaty as to require compensation to the tribe, if the United States thereafter appropriated lands within the area. See *Shoshone Tribe* v. *United States,* 299 U. S. 476, 486; 44 Stat. 1349. The effect of restoration under the Wheeler-Howard Act will depend upon the provisions of law under which the separate reservations exist. Compare Cohen, Handbook of Federal Indian Law, c. 5, § 5A, p. 94.

to regulate the use thereof, nor the right of the United States to resume possession of such lands, it being declared that all such rights shall continue to be held by the United States in trust for the people of any State or States which may hereafter be erected out of said Territory. The term 'navigable waters,' as herein used, shall be held to include all tidal waters up to the line of ordinary high tide and all nontidal waters navigable in fact up to the line of ordinary high-water mark." Indeed the United States affirms in its brief that Karluk Reservation is merely a reservation "for a particular governmental use," not a disposal of the area. The Government says it is like *Sioux Tribe* v. *United States,* 316 U. S. 317, not like *United States* v. *Holt Bank,* 270 U. S. 49.

An Indian reservation created by Executive Order of the President conveys no right of use or occupancy to the beneficiaries beyond the pleasure of Congress or the President. Such rights may be terminated by the unilateral action of the United States without legal liability for compensation in any form even though Congress has permitted suit on the claim. *Sioux Tribe* v. *United States,* 316 U. S. 317; see *United States* v. *Santa Fe Pacific R. Co.,* 314 U. S. 339 at 347.[22] When a reservation is established by a treaty ratified by the Senate or a statute, the quality of the rights thereby secured to the occupants of the reservation depends upon the language or purpose of the congressional action.[23] Since Congress, under the Constitution, § 3 of Art. IV, has the power to dispose of

[22] Possible claims under the Indian Claims Commission Act of August 13, 1946, are not covered by this statement. See 60 Stat. 1049, 1050, § 2 (5). It refers to claims "based upon fair and honorable dealings that are not recognized by any existing rule of law or equity No claim accruing after the date of the approval of this Act shall be considered by the Commission."

[23] *United States* v. *Shoshone Tribe,* 304 U. S. 111, 116; *Shoshone Tribe* v. *United States,* 299 U. S. 476, 485, 486, 492, *First; United States* v. *Creek Nation,* 295 U. S. 103, 109 · *United States* v. *Holt*

the lands of the United States, it may convey to or recognize such rights in the Indians, even a title equal to fee simple, as in its judgment is just. *Shoshone Indians* v. *United States*, 324 U. S. 335, 339, 340. When Congress intends to delegate power to turn over lands to the Indians permanently, one would expect to and doubtless would find definite indications of such a purpose.[24]

In the present case a determination of the power delegated to the Secretary of the Interior by the Wheeler-Howard Act of June 18, 1934, and § 2 of the Act of May 1, 1936, is important. It is important for the reason that a statute that authorizes permanent disposition of federal property would be most strictly construed to avoid inclusion of fisheries by implication. Petitioner argues for a holding that be power granted covers water as well as land. If that power were broad enough to enable the Secretary to designate nonrevocable or permanent reservations of all Alaska fishing grounds for the sole benefit of natives living in villages adjacent to the fisheries, it might place in his hands the power to grant the natives

---

*State Bank*, 270 U. S. 49, 58; *Ute Indians* v. *United States*, 330 U. S. 169, 176, *et seq.*; *Arenas* v. *United States*, 322 U. S. 419; opinions on remand, *United States* v. *Arenas*, 158 F. 2d 730; *Arenas* v. *United States*, 60 F. Supp. 411.

[24] For example, in the *Arenas* case, 322 U. S. 419, the statute read: "Sec. 5. That upon the approval of the allotments provided for in the preceding section by the Secretary of the Interior he shall cause patents to issue therefor in the name of the allottees, which shall be of the legal effect and declare that the United States does and will hold the land thus allotted for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the State of California, and that at the expiration of said period the United States will convey the same by patent to the said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever. . . ." P. 422.

the right to exclude all other fishermen from the fisheries. In this present case, for example, it might mean that the native residents of the Karluk Reservation would have the perpetual use and enjoyment of this valuable Karluk fishery for themselves and their licensees.[25] On May 23, 1944, a year after Public Land Order 128, the petitioner shows that there were 57 residents eligible to vote for approval of the designation of the reservation.[26] As indicated by the cases hereinbefore cited, a recognition of such ownership in Indians might require just compensation to them of the fair value of the fishery, if the United States should desire hereafter to reopen the area to the public under its regulations. There is much less reason to read such power of permanent disposition by the Secretary into § 2 than there was to read it into the President's "implied grant of power" to create reservations. *United States* v. *Midwest Oil Co.*, 236 U. S. 459, 475. It would take specific and unambiguous legislation to cause us to rule that Congress intended to authorize the Secretary of the Interior to alienate the Alaska fisheries permanently from public control.[27] The argument that Congress did not intend to

[25] One gets a sense of its value from the catch of a single operator. Note 10, *supra*.

[26] We understand, although it is not a fact of weight, that the number includes both men and women over twenty-one. 49 Stat. 1251; Constitution and By-Laws of the Native Village of Karluk, Alaska, Official Publication, United States Department of the Interior, Office of Indian Affairs, GPO (1939); Constitution, Art. V, § 1; Certificate of Adoption, p. 4; 48 Stat. 986–87, §§ 13 and 16.

The population of Karluk around 1880 was 302. Report on the Population, Industries, and Resources of Alaska by Ivan Petroff, p. 29, H. R. Misc. Doc. No. 42, Pt. 8, 47th Cong., 2d Sess. In 1920 it was 99; in 1929 it was 192; in 1939 it was 189. 16th Census of the United States (1940), Population, vol. 1, Number of Inhabitants, p. 1193.

[27] In the Act of May 14, 1898, 30 Stat. 409, which extended the homestead land laws of the United States to Alaska, it was specifically provided that "no entry shall be allowed extending more than eighty

authorize the designation of water or fisheries as a part of an Indian reservation has behind it the unarticulated premise that the United States must have complete power to protect, improve and regulate for the good of all our people these unrivalled sea fisheries with their wealth of food. It loses much of its force by our conclusion that Alaskan Indian reservations established or enlarged under § 2 are subject to the unfettered will of Congress.[28]

(b) An argument that the reservation is a nonrevocable grant can be made. Under the Act of June 18,

---

rods along the shore of any navigable water, and along such shore a space of at least eighty rods shall be reserved from entry between all such claims, and that nothing herein contained shall be so construed as to authorize entries to be made, or title to be acquired, to the shore of any navigable waters within said District: . . . ."

[28] Compare the statute creating the Metlakahtla Reservation, 26 Stat. 1101:

"SEC. 15. That until otherwise provided by law the body of lands known as Annette Islands, situated in Alexander Archipelago in Southeastern Alaska, on the north side of Dixon's entrance, be, and the same is hereby, set apart as a reservation for the use of the Metlakahtla Indians, and those people known as Metlakahtlans who have recently emigrated from British Columbia to Alaska, and such other Alaskan natives as may join them, to be held and used by them in common, under such rules and regulations, and subject to such restrictions, as may [be] prescribed from time to time by the Secretary of the Interior." See 34 Stat. 1411 and 48 Stat. 667.

See a discussion of the limited power of the President to create even temporary reservations for Indian immigrants. 18 Op. Atty. Gen. 557.

We have carefully considered the opinion in *Miller* v. *United States*, 159 F. 2d 997, where it is held, p. 1001, that the Indian right of occupancy of Alaska lands is compensable. With all respect to the learned judges, familiar with Alaska land laws, we cannot express agreement with that conclusion. The opinion upon which they chiefly rely, *United States* v. *Alcea Band of Tillamooks*, 329 U. S. 40, is not an authority for this position. That opinion does not hold the Indian right of occupancy compensable without specific legislative direction to make payment. See also *United States* v. *10.95 Acres of Land in Juneau*, 75 F. Supp. 841.

1934, § 16, applicable to Alaska, see § 13, an Indian tribe was authorized to adopt a constitution and by-laws for its government. This was done by the Karluk Reservation Indians. There is a phrase in the section that has color of recognition of ownership of tribal lands in the Indians. It reads as follows:

> "In addition to all powers vested in any Indian tribe or tribal council by existing law, the constitution adopted by said tribe shall also vest in such tribe or its tribal council the following rights and powers: . . . to prevent the sale, disposition, lease, or encumbrance of tribal lands; interests in lands, or other tribal assets without the consent of the tribe; . . . ." 48 Stat. 987.[29]

We think, however, in view of the breadth of the coverage of the Wheeler-Howard Act that this language would be effective only where there has been specific recognition by the United States of Indian rights to control absolutely tribal lands.

---

[29] In hearings before the Senate Committee on Indian Affairs, 73d Cong., 2d Sess., on S. 3645, the bill which became the Act of June 18, 1934, p. 247, the following discussion took place as to the meaning of these words:

"Senator O'MAHONEY. But what you are saying here is that the constitution shall vest in some person—what? The following rights and powers. And then you undertake to enumerate those powers. The first one that you enumerate is the right to employ counsel. The second one is the right to prevent individuals from selling and disposing of their property. Then you come to a third one and it is to represent the tribe, and that seems to me to be hanging up in the air.

"The CHAIRMAN. The second one you stated incorrectly.

"Senator O'M. HONEY. Have I?

"The CHAIRMAN. It is not to prevent them from selling individual lands; it is tribal lands.

"Senator O'MAHONEY. Yes, that is right; tribal lands."

Persuasive of this conclusion is that the bill when originally proposed by Interior provided in § 7 of Title III that "Title to any land acquired pursuant to the provisions of this section shall be taken in the name of the United States in trust for the Indian tribe or community for whom the land is acquired, *but title may be transferred by the Secretary to such community under the conditions set forth in this Act.*" The italicized words were omitted when this section was incorporated into § 5 of the Wheeler-Howard Act. See Hearings before House Committee on Indian Affairs, 73d Cong., 2d Sess., on H. R. 7902, p. 9.

Turning to § 2 of the Act of May 1, 1936, the strongest argument for the nonrevocability of a reservation created under § 2 of that Act comes from a letter of the Secretary of the Interior printed in the House and Senate Reports on the bill which became the Act in question.[30] The reports, speaking of § 2, said:

"This provision in reality carries out the promise of this Government contained in its act approved on May 17, 1884 (23 Stat. 26), as follows:

" '*Provided,* That the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress.' " H. R. Rep. No. 2244, 74th Cong., 2d Sess., p. 3.

The pertinent part of the letter is set out below.[31] The legislation was, of course, a fulfillment of the aid fore-

---

[30] H. R. Rep. No. 2244 on H. R. 9866, 74th Cong., 2d Sess.; S. Rep. No. 1748 on S. 4420, 74th Cong., 2d Sess.

[31] "An even more important reason for the designation of reservations in Alaska is that by doing so the United States Government will have fulfilled in part its moral and legal obligations in the pro-

shadowed in the statutes referred to in the letter. Such references to general legislation on public lands in the huge Territory of Alaska, however, cannot be treated as an adequate basis for courts to declare that power was given the Secretary of the Interior to dispose finally of Alaska lands. The first section of the Act of May 1 was a mere amendment of the Wheeler-Howard Act to bring Alaska under its coverage. The Wheeler-Howard Act did not authorize the creation of Indian reservations. Section 2 of the act extending the Wheeler-Howard Act to Alaska was intended to permit the organization of the Alaska natives so that they could avail themselves

---

tection of the economic rights of the Alaska natives. In at least two acts of Congress this obligation is specifically acknowledged. The act approved on May 17, 1884 (23 Stat. 26), contains the following language: 'Provided, That the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress.'

"The act of March 3, 1891 (26 Stat. 1100), contains similar language: 'That none of the provisions of the last two preceding sections of this Act shall be so construed as to warrant the sale of any lands belonging to the United States which shall contain coal or the precious metals, or any townsite, or which shall be occupied by the United States for public purposes, or which shall be reserved for such purposes, or to which the natives of Alaska have prior rights by virtue of actual occupation.' Lands which should have been, by virtue of these acts, segregated for natives of Alaska have not been so segregated. The provisions of section 2 of H. R. 9866 will aid the Federal Government in rectifying this condition, and in protecting the interests of the natives in the future. Section 2 of the bill which gives to the Secretary of the Interior power to designate certain lands as Indian reservations is, therefore, a logical sequence of the legislative history regarding Indian lands in Alaska and provides a method by which the financial aid provisions of the Indian Reorganization Act may be extended to those Indians and Eskimos of Alaska who occupy established villages."

of the earlier Act.[32]  It cannot be said, we think, that such reservations may be permanent or nonrevocable.  A reading of § 2 will show that there are no words with the connotation of recognition or conveyance of title. There are no words, such as appear in other statutes,[33] reserving the right of exploration, discovery and claim for precious metals and valuable minerals.  There is no discussion in the reports or the debates that show a definite intention of anyone to part with public property to establish an Alaskan Indian communal system.  Under such circumstances, we think the land and water reservations created under § 2 are reservations at will.

(c) We are convinced that § 2 of the Act of May 1, 1936, authorizes the Secretary of the Interior to include in the Karluk Reservation the waters described in § 2 of Public Land Order No. 128.  To interpret the clause "or any other public lands which are actually occupied by Indians or Eskimos within said Territory" to describe only land above mean low tide is too restrictive in view of the history and habits of Alaska natives

---

[32] This appears from the following excerpt from the Secretary's letter:

"Indian tribes do not exist in Alaska in the same sense as in continental United States.  Section 19 of the Indian Reorganization Act defines the word 'tribe' as referring to 'Any Indian tribe, organized band, pueblo, or the Indians residing on one reservation.' With a few exceptions the lands occupied by natives of Alaska have not been designated as reservations.  In order, therefore, to define an Alaskan tribe it is necessary to identify it with the land it occupies and in terms of the language of the act, 'reservation.' In addition, if native communities of Alaska are to set up systems of local government, it will be necessary to stipulate the geographical limits of their jurisdictions.  Reservations set up by the Secretary of the Interior will accomplish this." This, with the proviso of the first section, was deemed sufficient to enable the lands to be identified and to permit the Wheeler-Howard benefits to be available to the Alaska natives.

[33] 36 Stat. 847, § 2.

and the course of administration of Indian affairs in that Territory. The title to the uplands and waters in question is in the United States.[34] The fisheries as well as the uplands are subject to its present control.[35] In 1868 Congress extended our laws relating to customs, commerce and navigation over the "mainland, islands, and waters of the territory." 15 Stat. 240. The seal

---

[34] Treaty with Russia, proclaimed June 20, 1867, 15 Stat. 539, 541-542:

Art. II. "In the cession of territory and dominion made by the preceding article are included the right of property in all public lots and squares, vacant lands, and all public buildings, fortifications, barracks, and other edifices which are not private individual property. . . ."

Art. III. "The inhabitants of the ceded territory, according to their choice, reserving their natural allegiance, may return to Russia within three years; but if they should prefer to remain in the ceded territory, they, with the exception of uncivilized native tribes, shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizens of the United States, and shall be maintained and protected in the free enjoyment of their liberty, property, and religion. The uncivilized tribes will be subject to such laws and regulations as the United States may, from time to time, adopt in regard to aboriginal tribes of that country."

[35] Alaska Pacific Fisheries v. United States, 248 U. S. 78, 87; Shively v. Bowlby, 152 U. S. 1, 47, and cases cited; Mann v. Tacoma Land Co., 153 U. S. 273, 283. See also Tulee v. Washington, 315 U. S. 681. In Knight v. U. S. Land Association, 142 U. S. 161, the Court said, p. 183: "Upon the acquisition of the territory from Mexico the United States acquired the title to tide lands equally with the title to upland; but with respect to the former they held it only in trust for the future States that might be erected out of such territory." In Alaska Pacific Fisheries v. United States; supra, the statement is made, p. 87, "That Congress had power to make the reservation inclusive of the adjacent waters and submerged land as well as the upland needs little more than statement. All were the property of the United States and within a district where the entire dominion and sovereignty rested in the United States and over which Congress had complete legislative authority." Compare also Borax, Ltd. v. Los Angeles, 296 U. S. 10, 15.

112

islands and the waters adjacent thereto were promptly
made a reservation for the preservation and exploita-
tion of the seal fishery. 15 Stat. 348, 16 Stat. 180.
A civil government for the new territory was set up
in 1884. 23 Stat. 24. In that act appeared the pro-
viso referred to *supra,* n. 31, in the letter of the Sec-
retary of the Interior. By § 12 a commission was em-
powered to report upon the condition of the Indians.[36]
On June 30, 1885, the Commission reported to the
Secretary of the Interior as to the fisheries in the words
in the margin below.[37]

By virtue of § 15 of the act of Congress of March 3,
1891, *supra,* note 28, the Congress set apart the "body of
lands known as Annette Islands" in Alaska for a reserva-
tion for the Metlakahtla Indians. Nothing was said as
to fishing rights. A presidential proclamation of April
28, 1916, reserved to them the surrounding waters within

---

[36] 23 Stat. 27:

"SEC. 12. That the Secretary of the Interior shall select two of the
officers to be appointed under this act, who, together with the gov-
ernor, shall constitute a commission to examine into and report upon
the condition of the Indians residing in said Territory, what lands,
if any, should be reserved for their use, what provision shall be
made for their education what rights by occupation of settlers should
be recognized, and all other facts that may be necessary to enable
Congress to determine what limitations or conditions should be
imposed when the land laws of the United States shall be extended
to said district; and to defray the expenses of said commission the
sum of two thousand dollars is hereby appropriated out of any
moneys in the Treasury not otherwise appropriated."

[37] "The General Land Laws of the United States should be extended
over the Territory as early as possible. The Natives claim only
the land on which their houses are built and some garden patches
near their villages; they ask or expect nothing more. A deed for
their lots in severalty would be a very highly prized document by
them. The fisheries occupied by them before the advent of the
Whites should also be secured to them against encroachment. They
ask only the same rights and protection given the white man."

3,000 feet. 39 Stat. 1777.[38] After the proclamation a proceeding was brought by the United States relying upon the statute and proclamation to oust a fish trap of the Alaska Pacific Fisheries from the waters mentioned in the proclamation. Such a decree was obtained in the District Court and affirmed by the United States Court of Appeals for the Ninth Circuit on the ground "that the reservation of Annette Island by the act of Congress, and of its surrounding waters by the President's proclamation, is fully sustained." *Alaska Pacific Fisheries* v. *United States*, 240 F. 274, 283. For the validity of the proclamation, reliance was placed upon his power to reserve lands for reservations without specific authority. See *United States* v. *Midwest Oil Co., supra*. This Court affirmed the decree as to the waters within 3,000 feet of the shore lines. Although in the brief a vigorous attack was made on the power to issue the proclamation covering the waters, the proclamation was not referred to in the unanimous opinion here. This Court felt com-

---

[38] "Now, therefore, I, Woodrow Wilson, President of the United States of America, by virtue of the power in me vested by the laws of the United States, do hereby make known and proclaim that the waters within three thousand feet from the shore lines at mean low tide of Annette Island, Ham Island, Walker Island, Lewis Island, Spire Island, Hemlock Island, and adjacent rocks and islets, located within the area segregated by the broken line upon the diagram hereto attached and made a part of this proclamation; also the bays of said islands, rocks, and islets, are hereby reserved for the benefit of the Metlakahtlans and such other Alaskan natives as have joined them or may join them in residence on these islands, to be used by them under the general fisheries laws and regulations of the United States as administered by the Secretary of Commerce. "Warning is hereby expressly given to all unauthorized persons not to fish in or use any of the waters herein described or mentioned."

A presidential proclamation had theretofore, 1892, set apart Afognak Island, Alaska, and its adjacent bays and territorial waters as a public reservation for fish culture without specific authority to reserve waters. 27 Stat. 1052.

pelled to decide that the fisheries were included in the language of the statute by the purpose to assist the Indians to train themselves. Fishing was said to give value to the islands. "The use of the adjacent fishing grounds was equally essential. Without this the colony could not prosper in that location." *Alaska Pacific Fisheries* v. *United States,* 248 U. S. 78, 89.

The conditions as to the waters around the Annette Islands closely parallel those of other Alaska areas actually occupied by natives. The Annette Islands case was relied upon by the Secretary of the Interior for his authority to include the fisheries under § 2 of the Act of May 1, 1936. 56 Int. Dept. 110. The Alaska aborigines, like the Metlakahtlans, are fishermen. They, too, depend upon the waters for a large part of their support. For them the adjacent fisheries are as important as, perhaps more important than, the forests, the fur-bearing animals or the minerals.

Respondents urge upon us the cases in this and other courts which have held that the phrase "public lands," the term now under consideration, used in § 2 of the Act of May 1, 1936, does not include any area extending below mean high tide.[39] As the respondents state, this case turns not on tidelands, the area between mean high and mean low tides, but on whether the Secretary could include coastal waters in the reservation, *i. e.,* the area

[39] *Borax, Ltd.* v. *Los Angeles,* 296 U. S. 10, 17, 22. This case turned on the power of the United States to convey tideland seaward of the line of mean high tide after California's admission, to the Union. Public lands there could not include tidelands as they passed to California when she became a state. The cases cited in the *Borax* case to support the statement as to public lands are cases that have nothing to do with tidelands or coastal waters but depend upon whether the lands in question were subject to disposal as property of the United States, *i. e.,* public lands. See *Newhall* v. *Sanger,* 92 U. S. 761, 763; *Barker* v. *Harvey,* 181 U. S. 481, 490; *Union Pacific R. Co.* v. *Harris,* 215 U. S. 386, 388.

"3,000 feet from the shore line at mean low tide." As we understand respondents' argument and as we see this case, the question of tidelands is not significant. Reference to *Mann* v. *Tacoma Land Co.*, 153 U. S. 273, 283, will make clear respondents' position. Before the admission of Washington to statehood, November 11, 1889, 26 Stat. 1552, the United States issued land scrip to Mann for location on "unoccupied and unappropriated public lands" and the holder made location on tidelands and received the register's certificate therefor. When Mann sought to restrain trespass on the land so obtained, this Court held: "It is settled that the general legislation of Congress in respect to public lands does not extend to tide lands. There is nothing in the act authorizing the Valentine scrip, or in the circumstances which gave occasion for its passage, to make an exception to the general rule." P. 284. Respondents assert that the reference to public lands in § 2 should be construed in the same manner, since the federal land laws apply to Alaska [40] as do the reasons for excluding waters seaward of mean high tide.[41]

The Government points out that the cases relating to the limits of "public lands" are cases where final disposition, not temporary use, of the lands appeared. When one deals with a statute so large in purpose as to justify the above-quoted comment of the Secretary of the Interior that it "provides a method by which the financial aid provisions of the Indian Reorganization Act may be extended to those Indians and Eskimos of Alaska who occupy established villages," one may not fully com-

---

[40] Act of May 14, 1898, c. 299, 30 Stat. 409, 48 U. S. C. § 371 (homestead laws); Act of March 3, 1899, c. 424, 30 Stat. 1098, 48 U. S. C. § 351 (public land surveys); Act of March 2, 1907, c. 2537, 34 Stat. 1232, 48 U. S. C. § 365 (land districts).

[41] See also *Miller* v. *United States*, *supra*, note 28; *Heckman* v. *Sutter*, 128 F. 393.

·prehend the statute's scope by extracting from it a single phrase, such as "public lands," and getting the phrase's meaning from the dictionary or even from dissimilar statutes. Section 2 of the Act of May 1, 1936, is but one of a series of enactments relating to Alaska natives, lands and fisheries. It must "be taken as intended to fit into the existing system" and interpreted in that aspect.[42] There is nothing that we have found in the statute or the legislative history to justify the significance put upon the use of the words "public lands" in the clause of § 2 under discussion instead of "lands" used in the preceding clauses. If a differentiation was intended, surely it would have been more definitely expressed.

Taking into consideration the importance of the fisheries to the Alaska natives, the temporary character of the reservation, the Annette Islands case, the administrative determination, the purpose of Congress to assist the natives by the Alaska amendment to the Wheeler-Howard Act, we have concluded that the Secretary of the Interior was authorized to include the waters in the reservation. No injunction therefore may be obtained because of the invalidity of Order No. 128.

## III.

Subdivision II of this opinion has been directed toward the determination of the scope of § 2 of the Act of May 1, 1936, extending the Wheeler-Howard Act to Alaska. We were led to hold that Order 128, set out in full in note 1, *supra*, validly included in the reservation the waters to a distance of 3,000 feet from its shores. In his handling of the problems of the Karluk natives as affected by their need for a reservation and fishing rights, the Secretary of the Interior took another step under the authority of § 1 of another act, the White

[42] Cf. *United States* v. *Jefferson Electric Co.*, 291 U. S. 386, 397.

Act. The section is set out at length in the text beginning on page 92 of this opinion. The Act was for the protection of the fisheries of Alaska. Section 1 authorized the Secretary to set apart fishing areas in any of the waters of Alaska and establish in those preserves closed seasons "during which fishing may be limited or prohibited."

Pursuant to this statute detailed regulations were issued by the Secretary of Commerce and they have been continued by the Secretary of the Interior since Reorganization Plan No. II, note 4, *supra*.[43] One area established was the Kodiak Area which included the waters here in question.[44] Among the waters at first closed to commercial salmon fishing were the Karluk River spawning waters and those within 100 yards of its mouth.[45] Later the Secretary of the Interior, still acting solely under § 1 of the White Act, added the waters of the Karluk Reservation to the prohibited areas.[46] An exception was made in the regulation to the prohibition against fishing in the reservation waters. The precise language of the entire subsection (r) of the regulation, § 208.23, is on page 92 of this opinion. We repeat here the exception:

> "The foregoing prohibition shall not apply to fishing by natives in possession of said reservation, nor to fishing by other persons under authority granted by said natives (49 Stat. 1250; 48 U. S. C. 358a). Such authority shall be granted only by or pursuant to ordinance of the Native Village of Karluk, approved by the Secretary of the Interior or his duly authorized representative."

---

[43] Alaska Fisheries General Regulations, 50 C. F. R., c. II, p. 2333.
[44] *Id.*, p. 2355; 3 Fed. Reg. 393.
[45] *Id.*, p. 2359.
[46] 11 Fed. Reg. 3105, 9528.

The citation to 49 Stat. 1250 is to the Act of May 1, 1936, authorizing the creation of the reservation. Perhaps it was thought that the creation of the reservation justified this exception in the White Act regulation but we do not understand that any support from that Act is claimed for the establishment of the White Act preserve.

The validity of the exception permitting fishing by natives in possession of the reservation and their licensees is challenged by respondents because of a proviso in § 1 of the White Act, reading:

> "*Provided,* That every such regulation made by the Secretary of Commerce shall be of general application within the particular area to which it applies, and that no exclusive or several right of fishery shall be granted therein, nor shall any citizen of the United States be denied the right to take, prepare, cure, or preserve fish or shellfish in any area of the waters of Alaska where fishing is permitted by the Secretary of Commerce. . . ."

Respondents alleged that the exception for fishing by natives and their licensees made § 208.23 (r) wholly illegal because it was inconsistent with the proviso of § 1 of the White Act as to exclusive or several right of fishery. The District and Circuit Courts agreed with this argument and the District Court said that the regulation must be viewed in its entirety, 67 F. Supp. 43, 49. We agree that it is not possible to separate the closing of the area from the exception and thus hold the closing applicable to everyone. A right to fish locally is too important to the natives in Alaska for us to conclude from this record that the Secretary would have promulgated the prohibition to fish for salmon in reservation waters without the exception in favor of the natives. We have no doubt, however, that the White Act authorizes the establishment of White Act preserves or

closed areas in reservations created, as the Karluk Reservation, under § 2 of the Act extending the Wheeler-Howard Act to Alaska. No implications can be drawn from the broad and clear language of the White Act that reservation waters, however valuable for fishing or fish propagation, must be left unprotected from ruthless exploitation.

What we have said heretofore in this opinion as to the importance of fisheries and their conservation to Alaska natives with reference to the Karluk River area in particular need not be repeated. The quoted section of the White Act gives power to the Secretary so that he may "(c) make such regulations as to time, means, methods, and extent of fishing as he may deem advisable." Then follows the proviso that every such regulation shall be of general application and that no exclusive or several right of fishing shall be granted therein. This section was enacted to correct alleged abuses that arose in the administration of the Act "For the protection and regulation of the fisheries of Alaska," approved June 26, 1906, 34 Stat. 478. By § 6 of the earlier act, streams or lakes could be set aside as permanent preserves but not coastal waters. Although the 1906 Act did not delegate regulatory powers in the amplitude of the White Act, fishing reservations in territorial waters were created by Executive Order and regulations were issued thereunder.[47] The policy behind these regulations and their administration was to restrict the right to fish commercially to those who had formerly fished in these areas. See Fisheries Service Bulletin No.

---

[47] Executive Order of Feb. 17, 1922, creating the Alaska Peninsula Fisheries Reservation; Executive Order No. 3752 of Nov. 3, 1922, creating the Southwestern Alaska Fisheries Reservation. Regulations issued under these two Executive Orders are printed in the Fisheries Service Bulletin of the Bureau of Fisheries, Dept. of Commerce, No. 92, Jan. 2, 1923.

92, Jan. 2, 1923. Congress did not propose that these rich fishing grounds should be monopolized by this defined group. The legislative history of the White Act only emphasizes what the statute clearly says, that is, no special privileges in Alaskan fishing preserves.[48] The enforcement provisions of the White Act gave stern warning to prospective violators.[49]

---

[48] 65 Cong. Rec. 5974; 65 Cong. Rec. 9520–21; 65 Cong. Rec. 9681 et seq.; H. R. Rep. No. 357, 68th Cong., 1st Sess., p. 2; S. Rep. No. 449, 68th Cong., 1st Sess., p. 5; House Hearings, Committee on Merchant Marine and Fisheries, Fisheries of Alaska (1924), on H. R. 2714, January 31–February 8, 1924, 68th Cong., 1st Sess., p. 21, et seq. Note that this is a different bill than H. R. 8143 which became the White Act but the subject was the same. See H. R. Rep. No. 357, supra, p. 1. Dow v. Ickes, 74 App. D. C. 319, 123 F. 2d 909.

[49] 43 Stat. 466:

"Sec. 6. Any person, company, corporation, or association violating any provision of this Act or of said Act of Congress approved June 26, 1906, or of any regulation made under the authority of either, shall, upon conviction thereof, be punished by a fine not exceeding $5,000 or imprisonment for a term of not more than ninety days in the county jail, or by both such fine and imprisonment; and in case of the violation of section 3 of said Act approved June 26, 1906, as amended, there may be imposed a further fine not exceeding $250 for each day the obstruction therein declared unlawful is maintained. Every boat, seine, net, trap, and every other gear and appliance used or employed in violation of this Act or in violation of said Act approved June 26, 1906, and all fish taken therein or therewith, shall be forfeited to the United States, and shall be seized and sold under the direction of the court in which the forfeiture is declared, at public auction, and the proceeds thereof, after deducting the expenses of sale, shall be disposed of as other fines and forfeitures under the laws relating to Alaska. Proceedings for such forfeiture shall be in rem under the rules of admiralty.

"That for the purposes of this Act all employees of the Bureau of Fisheries, designated by the Commissioner of Fisheries, shall be considered as peace officers and shall have the same powers of arrest of persons and seizure of property for any violation of this Act as have United States marshals or their deputies."

For the conservation of the fisheries, it was recognized that administrative flexibility must be permitted.

> "The waters of Alaska are so vast and the local conditions so varied that it is utterly impossible to prescribe by legislation in detail the provisions necessary to meet each situation. To attempt to do so would be to defeat the purposes sought. This can be done by placing broad powers and a wide discretion in the administrative branch having charge of the subject." S. Rep. No. 449 on H. R. 8143 (which became the White Act), 68th Cong., 1st Sess., p. 2. Compare *Dow* v. *Ickes,* 74 App. D. C. 319, 323, 123 F. 2d 909, 913.

Although § 8 of the White Act [50] left a power in the Territorial Legislature of Alaska to impose taxes or licenses for fishing, we do not read § 8 as limiting the power to license fishing to the Territorial Legislature. The section does not make the legislative power exclusive. Since § 1 of the White Act not only authorizes the establishment of fishing preserves but also requires that the fishing be carried on "in conformity with such rules and regulations as the Secretary prescribes under the authority herein given," [51] we are of the opinion that licenses for fishing may be required in areas regulated under the White Act. We think, however, these licenses may be only regulatory in character and, within the discretion of the Secretary, must have their cost fixed so as not

---

[50] 43 Stat. 467:

"SEC. 8. Nothing in this Act contained, nor any powers herein conferred upon the Secretary of Commerce, shall abrogate or curtail the powers granted the Territorial Legislature of Alaska to impose taxes or licenses, nor limit or curtail any powers granted the Territorial Legislature of Alaska by the Act of Congress approved August 24, 1912, 'To create a legislative assembly in the Territory of Alaska, to confer legislative power thereon, and for other purposes.'"

[51] See § 1 of the White Act, pp. 92–93, *supra*.

to exceed the estimated approximate cost of reasonable policing of the area. We do not read the White Act as empowering the Secretary to raise general funds for native welfare or general conservation purposes from White Act preserves.

As § 208.23 (r) with its exception in favor of the natives in possession of Karluk Reservation and their licensees is based upon § 1 of the White Act, we think it clear that its proviso, "that no exclusive or several right of fishery shall be granted therein," applies to commercial fishing by natives equally with fishing companies, non-residents of Alaska or other American citizens, and so applies whether those natives are or are not residents on a reservation. We find nothing in the White Act that authorizes the Secretary of the Interior to grant reservation occupants the privilege of exclusive commercial fishing rights. It seems also clear to us that the adoption of a corporate charter and a constitution by the Native Village of Karluk under §§ 16 and 17 of the Wheeler-Howard Act, discussed at pp. 106–107, *supra*, can add nothing to the power of the Secretary under the White Act. "Exclusive," as used in § 1 of the White Act, forbids not only a grant to a single person or corporation but to any special group or number of people. The legislative history set out above shows this. The offending regulations which brought about the enactment of the proviso in § 1 of the White Act were administered so as to limit fishing to those who had been using the fisheries before the regulations. The White Act fishing preserves were not intended to furnish a monopoly to a favored few. Whatever may be the powers of the Department of the Interior or the natives as to regulating the entrance of persons other than natives in possession of Karluk Reservation into or on the area of land and water in that reservation,[52] they are not broad

---

[52] See 27 Stat. 631, relating to representation of Indians by the United States district attorneys; Cohen, Handbook of Federal Indian

enough to allow the use of the White Act sanctions to protect the reservation against trespass. White Act sanctions are for White Act violations. The Department of the Interior by § 208.23 (r) has decided upon the conservation of fisheries in the described waters of the Karluk Reservation in accordance with the White Act, with an exception in favor of the natives that seems to rest on the fact that the natives are on a reservation that includes the White Act conservation area. This cannot be done. The welfare of the 57 electors of Karluk Reservation and their families is important. The Secretary of the Interior, however, cannot give them such preferences as are here given under the authority of the White Act. Other American citizens are equally entitled to the benefits from White Act preserves.[53] We hold that the regulation § 208.23 (r) is void as a whole because it violates the proviso of the White Act. See p. 93.

## IV.

There are problems connected with the administration of the Karluk Reservation and the protection of the fishing preserves that have not been determined by the courts or the Department of the Interior. Our holding that coastal waters may be included in the reservation waters and that the White Act cannot be used to create a monopoly in the Indians establishes a different basis for administrative and judicial conclusions. The 1945 ordinance

---

Law, pp. 252–53; Powers of Indian Tribes, Solicitor of the Interior, Nathan R. Margold, October 25, 1934, M27781 pp. 55–58. See *United States* v. *Candelaria*, 271 U. S. 432; *United States* v. *Berrigan*, 2 Alaska 442; *United States* v. *Cadzow*, 5 Alaska 125.

[53] *Dow* v. *Ickes*, 74 App. D. C. 319, 326, 123 F. 2d 909, 916: "It prohibits monopoly, but it does not prohibit reasonable discriminations required by the purpose of conservation and limitations inherent in the type of fishing to which the Secretary's judgment must be applied."

must be considered; it appears in the margin.[54] · It states that Public Land Order 128 restricts the right to fish commercially in the reservation waters to Karluk inhabitants. This ordinance antedates the regulation. See p. 91, *supra*. It evidently is based on the theory that the creation of the reservation gave exclusive fishing rights to the natives in possession. Permits required the approval of the Secretary of the Interior or his au-

---

[54] "An Ordinance. Whereas, under Public Land Order 128, of May 22, 1943, creating the Karluk Reservation, the right to fish commercially in the waters of said reservation is restricted to the inhabitants of the Native Village of Karluk and vicinity, and;

"Whereas, non-residents desire to continue their fishing operations in the waters of said reservation;

Now, Therefore, be it ordained by the Council of the Native Village of Karluk, a federal corporation chartered under the Act of June 18, 1934, as amended;

"Section 1. That it shall be unlawful for any person, partnership, firm, association or corporation, to fish for, take or catch any fish, or to operate any fishing vessel, gear or equipment, within the waters of the Karluk Reservation except under a permit issued by the Native Village of Karluk, for which the fee shall be as follows:

"(A) For residents of the Territory of Alaska $1.00

"(B) For non-residents of the Territory of Alaska $25.00

"Provided further, that a person to qualify for a resident (Class A) permit must have resided in the Territory of Alaska for three consecutive years prior to the date of their application, or request, for a permit.

"Section 2. The possession of fish upon any vessel within said waters without a permit shall constitute prima facie evidence of a violation of this ordinance.

"Section 3. Any violation of this ordinance shall be punished by a fine of not exceeding Five Hundred Dollars ($500.)

"Approved this 31st day of May, 1945."

The 1946 ordinance made the fee $2.00 for residents of Alaska and $40.00 for nonresidents.

Karluk had received its corporate charter, constitution and by-laws August 23, 1939. Official publications, Office of Indian Affairs, Department of the Interior. See §§ 16 and 17, 48 Stat. 987, 988.

thorized representative.[55] An example of the permit is printed below.[56] We know nothing from the record of the reasons for the $2 fee for residents or the $40 fee for nonresidents or their relation to the cost of policing the area. See *Haavik* v. *Alaska Packers Association*, 263

---

[55] Section 5 of the Corporate Charter of the Native Village of Karluk provides that "In using its powers the corporation must not do the following things:

"Make leases, permits or contracts covering any lands or waters set aside as a reserve for the Village without the approval of the Secretary of the Interior or his authorized representative."

[56]       "*COMMERCIAL FISHING PERMIT*

"Karluk Indian Reservation, Karluk, Alaska, June 30, 1946.

"Pursuant to an Ordinance passed by the Council of the Native Village of Karluk, Alaska, dated May 31, 1946, permission is hereby given by the Native Village of Karluk to Ray Harmon of Kodiak, Alaska, to enter the waters and land of the Karluk Reservation for the purpose of engaging in commercial fishing for salmon, S. J. F. & P. Co., during the period:

"June 1946 to September 1946.

"This permit is issued subject to the conditions printed on the back hereof.

> EWAN M. NAUMOFF
>    ISSUING OFFICER
> PRESIDENT KARLUK
>    TITLE

I accept:                                  Approved:

RAY HARMON                           H. C. BINGHAM
   PERMITTEE                           APPROVING OFFICER

Boat No. or Name: Caroline       ASST. TEACHER A. N. S.
Fishing for: San Juan   UGANIK BAY, ALASKA   TITLE
(CANNERY)     NAME          ADDRESS

"*CONDITIONS*

"This permit is valid only if approved by the General Superintendent of the Indian Service in Alaska or his duly authorized representative, and is revocable in the discretion of the issuing officer. It is not transferable and must be carried on the person of the permittee

U. S. 510. So far as appears, after once approving an ordinance the Department's only direct control over the ordinance is by approval or disapproval of amendments.[57]

This is an equitable proceeding in which the respondents seek protection against unlawful action by petitioner, the Regional Director of the Fish and Wildlife Service of the Department of the Interior. The interests of respondents, the Indians of Karluk Reservation, and the efforts of the Department of the Interior to administer its responsibilities fairly to fishermen and Indians are involved.[58] These are questions of public policy which equity is alert to protect.[59] This Court is far removed from the locality and cannot have the understanding of the practical difficulties involved in the conflicts of interest that is possessed by the District Court. Therefore we think it appropriate for us to refrain from now entering a final order disposing definitively of the controversy.

---

when engaged in fishing authorized hereunder, and must be exhibited to any person requesting to see it. This permit is issued and accepted by the permittee on the express condition that the permittee will comply with all of the provisions of law and regulations governing fishing on the Karluk Indian Reservation, Alaska. The permittee is warned not to interfere with the fishing activities of the Indians of the Karluk Indian Reservation nor use, disturb, or destroy any property belonging to said Indians."

[57] Article VI of the Constitution of the Native Village of Karluk provides that "Changes in this Constitution and By-laws may be. made if the changes are approved by the Secretary of the Interior and by a majority vote of the Village members voting in an election called by the Secretary of the Interior at which at least 30 per cent of the voting membership take part."

[58] For a discussion of the difficulties of the preparation of regulations, compare *Addison* v. *Holly Hill Co.*, 322 U. S. 607. See also the statements of the Commissioner of Indian Affairs in Hearings before the House Committee on Indian Affairs, 73d Cong., 2d Sess., on H. R. 7902 (Wheeler-Howard Act).

[59] *Virginian R. Co.* v. *System Federation*, 300 U. S. 515, 552; *Harrisonville* v. *Dickey Clay Co.*, 289 U. S. 334, 338, note 2.

With our conclusion on the law as to the establishment of the reservation and the invalidity of the regulation before them, the Department and the parties should have a reasonable time, subject to the action of the District Court on the new proposals, to adjust their affairs so as to comply with our determinations.

We therefore vacate the decrees of the District Court and the Court of Appeals and remand this proceeding to the District Court with directions to allow thirty days from the issuance of our mandate for the Secretary of the Interior to give consideration to the effect of our decision. Unless steps are taken in this proceeding the District Court, on the expiration of thirty days, shall enter a decree enjoining the defendant Hynes and all acting in concert with him, substantially as ordered in the permanent injunction entered November 6, 1946.[60] If timely steps are taken, the District Court will, of course, be free to enter such orders as it may deem proper and not inconsistent with the present decision. Pending the entry of further orders by the District Court, the preliminary injunction entered July 18, 1946, shall apply to protect the rights of the respondents.

*It is so ordered.*

Mr. Justice Rutledge, with whom Mr. Justice Black and Mr. Justice Murphy agree, dissenting in part.

## I.

Jurisdictional questions aside, I am in full agreement with the Court's conclusion that Public Land Order 128, 8 Fed. Reg. 8557,[1] is valid and was effective, according to its terms, to include in the reservation for the Karluk In-

---

[60] Compare *Atlantic Coast Line* v. *Florida*, 295 U. S. 301, 314–15; *Burford* v. *Sun Oil Co.*, 319 U. S. 315, 333; *Addison* v. *Holly Hill Co.*, 322 U. S. 607, 620.

[1] Set forth at note 1 of the Court's opinion.

dians the tidelands and coastal waters therein described. This action was taken pursuant to the statutory authorizations recited in the order and particularly the Act of May 1, 1936, 49 Stat. 1250, 48 U. S. C. § 358a. When approved by the Indians in accordance with the proviso of the latter Act, Order 128 withdrew the area covered from any general or public right of access for fishing or other purposes inconsistent with those of the reservation and set aside that area for the exclusive benefit of the Indian occupants and inhabitants. Cf. *Alaska Pacific Fisheries* v. *United States,* 248 U. S. 78. The necessary effect was to forbid others to enter the area for purposes inconsistent with the reservation's objects, thus making persons so entering trespassers and subject to such remedies as the law may afford to prevent or redress their wrongful entry.

By his 1946 amendments to the Alaska Fisheries General Regulations, 50 C. F. R., 1946 Supp., § 208.23 (r), the Secretary of the Interior reinforced his prior action in setting aside the Karluk Reservation, prohibiting fishing within the coastal waters included in Public Land Order 128, except "by natives in possession of said reservation" and "by other persons under authority granted by said natives . . . by or pursuant to ordinance of the Native Village of Karluk" approved by the Secretary or his duly authorized representative.[2] This action was taken pursuant to 34 Stat. 263, 478, as amended by the White Act of June 6, 1924, 43 Stat. 464, as amended June 18, 1926, 44 Stat. 752.

That Act, in the interest of "protecting and conserving the fisheries of the United States in all waters of Alaska," conferred upon the Secretary of Commerce (now Interior), broad powers to "set apart and reserve fishing areas

---

[2] See text of the amended regulation as quoted in the Court's opinion at p. 92.

in any of the waters of Alaska over which the United States has jurisdiction" and within such areas to "establish closed seasons during which fishing may be limited or prohibited as he may prescribe." See *Dow* v. *Ickes*, 74 App. D. C. 319. Effective penal provisions by way of criminal sanctions and for seizure and forfeiture of offending boats, gear and appliances were enacted to prevent or redress violation of the regulations made pursuant to the statute's authorization.[3]

The promulgation of Amended Regulations § 208.23(r), pursuant to the White Act's provisions, reinforced the effect of Public Land Order 128 in withdrawing the area covered by the latter from public or common right of entry for fishing and other purposes. But it had also the further effect of notifying the public that trespass upon the reserved area by persons not entitled to enter and use it would be met with the White Act sanctions [4] for enforcement of the order and the amended regulations.

Although holding Public Land Order 128 valid and effective to establish the reservation for the Indians' exclusive benefit, the Court finds Amended Regulations § 208.23 (r) "void as a whole." The chief consequence held to follow is that the White Act sanctions cannot be applied to enforce the regulations or to prevent or redress trespass upon the reservation by others than the Indians in possession or their licensees.

With this conclusion I cannot agree. The amended regulations' invalidity is said to follow solely because of the exception permitting natives and their licensees to fish in reservation waters. This is said to violate the White Act proviso, which forbids any "exclusive or sev-

---

[3] Reference is made to the Court's opinion at pp. 92–93 for the pertinent language of the statute and at note 49 for the Act's penal provisions.

[4] See note 49, majority opinion.

eral right of fishery" and denial to any citizen of the right to fish in any waters where fishing is permitted by the Secretary's regulations. In other words, because the Secretary allows the Indians to fish in the reservation waters he must allow all others to do so on equal terms, otherwise his regulations become totally void and the White Act sanctions unavailable for protection of the reservations and the Indians' rights.

This view, it seems to me, rests upon two fallacies. One is that the two statutes, of 1936 and 1924, are in irreconcilable collision and the Secretary cannot exercise the powers given to him by the 1936 Act and by the White Act consistently and simultaneously with reference to the same waters. The other fallacy is a corollary, namely, that the White Act proviso applies wherever the White Act prohibitions and sanctions may be made applicable, even though the area is a valid Indian reservation.

I do not think the two statutes are in such inescapable inconsistency as forbids their simultaneous and harmonious application in setting aside and protecting reservations for the exclusive use and benefit of the native Indian population. Indeed their legislative history and purposes demonstrate that they were intended to serve common objects in the conservation and protection of Alaskan fisheries.

The White Act was adopted in 1924. Its primary object was to preserve the fisheries of Alaska from the destructive private exploitation then taking place. That evil did not arise from any previous, existing, or anticipated policy of setting aside reservations for the exclusive benefit of the natives. It arose exclusively from quite the contrary policy of permitting widespread commercial exploitation by specially favored groups, not of Indians but of others who sought and secured monopolistic privileges and favors in fishing. There were therefore twin evils at

which the White Act struck. One was the rapid and virtually unrestrained depletion and destruction of the fisheries; the other, the expanding creation of commercial monopolies fostered by preexisting policy in regulating the industry. 65 Cong. Rec. 9520–9521; see also 65 Cong. Rec. 9680–9682; H. R. Rep. No. 357, 68th Cong., 1st Sess. 2; S. Rep. No. 449, 68th Cong., 1st Sess. 5; Hearings before the House Committee on Merchant Marine and Fisheries on H. R. 2714, 68th Cong., 1st Sess.

The White Act, accordingly, was not merely and exclusively an antimonopoly statute. It was both a conservation measure and one to outlaw private, commercial monopoly. The conservation features were contained in the basic general provisions giving the Secretary his broad powers of control over fishing. The more specific antimonopoly features were included in the proviso. The latter were important. But they did not override or minimize the more general provisions, apart from the proviso, giving the Secretary power to regulate the industry in the interest of "protecting and conserving the fisheries of the United States in all waters of Alaska." The proviso merely limited the manner in which his power was to be exercised in the situations to which the proviso was applicable.

So the questions arise whether the proviso was intended to have any effect in waters validly set aside by Congress, executive order, or the Secretary as reservations for the exclusive benefit of the native population and, correlatively, whether the policy of the proviso was meant to forbid the application of other provisions of the White Act, including its prohibitions and sanctions, in the protection and conservation of such reservations. In other words, was the general policy of the White Act in conflict with the policy existing at its enactment concerning Alaskan Indian reservations or later under the 1936 Act,

so as to require that the two policies or statutes be kept entirely separate and distinct in their application and administration and to forbid them to be applied conjointly in executing their common conserving and protecting objects?

Certainly the White Act proviso had no purpose to throw open validly created Indian reservations to fishing by all comers. Its aim was not to destroy such reservations or to open them to general, common rights of fishing. In view of the legislative history cited above, which is consistently supported by subsequent administrative construction,[5] the proviso cannot be construed as expressing any policy hostile to creating such reservations with exclusive rights of fishing for the native population and protecting them against wrongful invasion. On the contrary, the statute, including the proviso, was strongly supported by the delegates in Congress from Alaska and others representing the native interests [6] as against those of commercial exploitation toward which the Act was aimed. There were numerous Indian reservations in existence at the time of the legislation, cf. *Alaska Pacific Fisheries* v. *United States, supra,* affording the natives exclusive fishing rights. But the extensive legislative history discloses no protest, complaint or concern arising on account of them. Indeed it gives strong reason for believing that the native interests joined with others in opposing continuance of the policy of monopolistic commercial exploitation and in support of the White Act, including the proviso, as a necessary method of preventing the imminent destruction of the natives' historic means

---

[5] See, *e. g.*, Department of Commerce, Laws and Regulations for Protection of Fisheries of Alaska (Dept. Circular No. 251, 13th ed.), Dec. 22, 1926; Op. of Solicitor, Dept. of Interior, 56 I. D. 110.

[6] See the legislative debates, reports and hearings cited in the text, *supra.*

of livelihood by that form of exploitation, and not at all by reason of any evils arising out of exclusive fishing rights granted to the native population in reservations validly created for its benefit.

Consequently, far from representing an attitude or purpose of hostility toward a policy of Indian reservations with exclusive native rights of fishing, the White Act constituted an effective step toward conserving the Alas-. kan fisheries, under the Secretary's broad regulatory powers, for such purposes as well as for the prevention of monopoly in open fishing areas where no reservations existed.

It follows, in my view, that the White Act proviso has, and was intended to have, no application to validly created Indian reservations, either to forbid the Secretary to exclude others than natives from fishing in the reservation waters or to compel him, if he allows the natives to fish, to permit all other citizens to do so on equal terms. The proviso had no purpose so to restrict his powers in relation to reservation areas. It was directed solely against abuses by other than native interests in waters not included within areas set aside for the natives' exclusive benefit.

But it does not follow, in my opinion, that because the proviso is inapplicable the Secretary is forbidden to exercise his regulatory and enforcing powers under the White Act in protection of reservations and the natives' exclusive rights in them or that he cannot utilize those powers and the White Act sanctions conjointly with his authority under the 1936 Act to create reservations and protect them against unlawful invasion. The White Act proviso aside as inapplicable in purpose and intent to the specific situation, i. e., one involving a validly created reservation, nothing in either statute forbids his doing so. Each is in terms a conservation measure, having the .

common object of preserving and protecting the Alaskan fisheries from unrestricted exploitation and destruction by commercial interests. That community of purpose is not affected by the fact that the one Act secures this protection for the public generally, the other for the special benefit of the native population. That difference merely means that two interests require and are given protection against a third, not that the latter acquires immunity against protection afforded either or both of the other two.

Accordingly, in my opinion, the White Act proviso being inapplicable to waters included in a valid Indian reservation, the two statutes may be applied to serve their basic common objects of conserving and protecting fisheries in all Alaskan waters, including those set apart as valid Indian reservations, as against the private, commercial exploitation and monopoly which the White Act and the Act of 1936 were intended to prevent. The statutes should be construed, and Congress, I think, intended them to be construed, so as to work together harmoniously, not irreconcilably, to achieve this object.

I therefore cannot regard Amended Regulations § 208.23 (r) as "void as a whole." The regulations are valid, in my judgment, and enforceable by application of the White Act sanctions, except possibly in one respect. This is the feature by which the Secretary has delegated to the Village of Karluk the authority by ordinance to license others than natives of the village to fish on terms fixed by the ordinance subject to the Secretary's approval. Conceivably that power might be exercised by the village, through licensing others than native inhabitants, in a manner which would violate the spirit of the White Act proviso, i. e., by licensing favored commercial interests so as to create essentially the type or types of monopoly or favoritism the proviso intended to forbid.

It is one thing of course for the Secretary to give the natives exclusive rights of fishing in the reservation's waters. It may be entirely another for him to delegate to them the licensing of others, even retaining the power to approve the licensing ordinance as Amended Regulations § 208.23 (r) does.

## II.

Whether or not the authority conferred by the regulations upon the village to license others is valid is a question, however, which I think it neither necessary nor appropriate to answer in this proceeding, for reasons affecting the existence and propriety of exercising equity jurisdiction in this cause, now to be stated.

I seriously doubt the existence of equity jurisdiction on the showing made by this record. But in any event I do not think it should be exercised to afford respondents the relief they have sought. The Secretary of the Interior, whose regulations and authority are at stake, has not been made a party to the suit. Nor has the Village of Karluk, which obviously is vitally interested. Moreover, the allegations concerning threatened enforcement of the regulations by White Act sanctions seem questionably sufficient to establish the basis for equitable intervention, in view of circumstances appearing in the record and asserted in briefs filed here questioning their sufficiency.

But, if all these factors are put to one side, one other remains which in my opinion precludes granting the equitable relief respondents seek. Their claim was founded in the complaint, as I think it had to be, not only upon the alleged invalidity of Amended Regulations § 208.23 (r), but also upon the asserted invalidity of Public Land Order 128. However, they have not been successful in the latter attack, for the Court holds that Public

Land Order 128 is valid and was effective to create the Karluk Reservation according to that order's terms.

This ruling cuts all valid ground from beneath respondents' claim to aid from a court of equity. With it, they come not as persons entitled of right to enter the reservation and fish, but solely as trespassers having no right of entry, but seeking only to avert the incidence of possible remedies for threatened wrongful entry. In effect the Court's decision is that respondents, although they have not put forward their case in this light, are entitled to have it so determined and to have equitable relief which prevents possible application of White Act sanctions against them. I cannot agree that persons so situated have standing to invoke the assistance of a court of equity. Accordingly I think the judgment should be reversed and the cause should be remanded with instructions to dismiss it.

MR. JUSTICE DOUGLAS joins in Part I of this opinion.