**DOWNSTATE STONE COMPANY, an Illinois Corporation, Plaintiff-Appellee,**

v.

**UNITED STATES of America, et al., Defendants-Appellants.**

No. 80–2491.

United States Court of Appeals, Seventh Circuit.

Argued May 14, 1981.

Decided June 19, 1981.

Rehearing and Rehearing In Banc Denied July 21, 1981.

David C. Shilton, AAG, Dept. of Justice, Appellate, Washington, D. C., for defendants-appellants.

James C. Cook, Walker & Williams, Belleville, Ill., for plaintiff-appellee.

Before SPRECHER, Circuit Judge, NICHOLS, Associate Judge,* and CUDAHY, Circuit Judge.

SPRECHER, Circuit Judge.

This case presents the question of the propriety of a preliminary injunction that enjoins the United States from enforcing, during the pendency of a quiet title action, several criminal statutes intended to protect our national forests and to insure compliance with the applicable rules and regulations of the United States Department of Agriculture Forest Service, which oversees the national forests. This dispute arises from a quiet title action brought by Downstate Stone Company ("Downstate") against the United States, pursuant to 28 U.S.C. § 2409a, to resolve the question of whether Downstate is entitled to quarry limestone under a mineral reservation Downstate holds on a parcel of land located in Shawnee National Forest. We reverse the district court's grant of a preliminary injunction and vacate the injunction immediately.

## I

The underlying quiet title dispute involves two parcels of land, a 40 acre tract referred to as the Purcell tract and an 80 acre tract referred to as the Wiedemann tract, which are part of the Shawnee National Forest in southern Illinois. The tracts are heavily forested lands of predominantly pole-size timber and underbrush and constitute a part of the northwest flank of a rugged, hilly section of forest known as the Cave Hill area. The tract contains a significant outcropping of high-grade Kincaid limestone.

The United States acquired title to the Purcell and Wiedemann tracts in 1935 pursuant to the Weeks Act, 16 U.S.C. § 515, et seq. Both the Wiedemann and Purcell conveyances contained the following reservation of mineral rights:

> * * * reserving, ... all minerals in, upon, or under the above described real estate, together with the right to prospect for and remove said minerals ....

The reservation on the Purcell tract was for a period of 50 years, expiring in 1985. The Wiedemann reservation was for 75 years, until 2010. Both conveyances stated that any operations to prospect for or extract the reserved minerals "shall be done and carried out in accordance with the following rules and regulations prescribed by the Secretary of the Department of Agriculture, ...."[1]

---

* Honorable Philip Nichols, Jr., Associate Judge for the United States Court of Claims, is sitting by designation.

1. The deeds recited ten rules and conditions that apply to any exercise of the reserved mineral rights, including the following which are relevant to this case:

> 1. Any one claiming the right to mine or search for minerals or mineral products in or

H. H. Barter, the 90% owner and chief operating officer of Downstate,[2] acquired title to the Purcell and Wiedemann mineral rights reservations in June and July, 1980, from the Purcell and Wiedemann heirs. At some point, no later than June, 1980, Barter contacted local Forest Service personnel regarding his plan to reopen a limestone quarry in the Cave Hill area that once operated during the 1930's. The contemplated quarry would include the Purcell and Wiedemann tracts and other surrounding properties, including some national forest lands to which the United States held title outright without any mineral reservations outstanding. According to Barter's testimony at the preliminary injunction hearing, six or seven meetings were held during June through September between representatives of Downstate and the Forest Service.

Barter acknowledged throughout these negotiations that, in order to exercise the mineral reservations, Downstate would have to comply with the rules and regulations of the Forest Service, as set forth in the 1935 deeds. A letter dated June 5, 1980, from John Ward, Elizabethtown District Forest Service Ranger, to Barter recounted a June 3, 1980 meeting between Barter and Forest Service representatives. The letter stated, *inter alia*, that "[t]he environmental assessment procedures and permit processing will require approximately 6 months to accomplish."

At some point during the negotiations, Barter was informed by Forest Service attorneys that the Forest Service took the position that the Purcell and Wiedemann mineral reservations did not include the right to extract limestone, as Barter sought to do.[3] The September 3, 1980 letter from David Jolly, Supervisor of the Shawnee Na-

---

upon lands acquired by the United States ..., with a reservation of mineral rights to the grantor, must, on demand, exhibit to the Forest Officer in charge satisfactory written evidence of right or authority derived from, through, or under the said grantor, mining or searching for minerals except by those producing such evidence of right or authority is forbidden.

2. In carrying on mining operations and in searching for minerals only so much of the surface shall be occupied or disturbed as is reasonably necessary for the purpose.

* * * * * *

4. All miners or mining operators shall make provision to the satisfaction of the Forest Officer in charge for preventing the obstruction, or deterioration of streams, lakes, ponds or springs, by tailings, dumpage, or otherwise or the escape of any harmful or deleterious material or substance from their mines or works.

5. In searching or excavating for minerals, in the dumping of ores or waste materials, and in the location and construction of buildings or works of any kind to be used in connection with mining or searching for minerals or with the milling or reduction of ores, no timber, undergrowth, or reproduction shall be unnecessarily cut, destroyed, injured, or damaged. For all timber, undergrowth, and reproduction unnecessarily cut, destroyed, injured, or damaged, payment shall be made to the United States, on demand of the proper Forest Officers ....

6. No timber shall be cut or used, for or in connection with any mining use or purposes except with the permission of the proper For-

est Officer first obtained and upon payment therefor at the price or prices fixed for timber of similar kinds.

7. Buildings, camps, roads, bridges, and other structures or improvements necessary in carrying on mining operations shall be located as approved by the Forest Officer in charge.

* * * * * *

2. On September 15, 1980, Barter and Downstate executed a lease and royalty agreement wherein Barter granted Downstate the exclusive right to "quarry, mine, remove, process and sell all of the limestone and other minerals" on the Purcell and Wiedemann tracts and on other property owned by Barter but not at issue in this lawsuit. Because of the intimate connection between Barter and Downstate, future references to Barter or Downstate are intended to refer to and include the other.

3. Barter asserts that during the early stages of the negotiations, he was misled by junior officers of the Forest Service into believing that the Purcell and Wiedemann mineral reservations included the right to extract limestone. Although Barter asserts that he was misled by these alleged statements, Downstate does not argue that, on the basis of these alleged statements of Forest Service personnel, the United States is estopped from now contesting whether the mineral reservations include limestone. Indeed, on the facts before us now, we would reject any such estoppel argument. *See United States v. California*, 332 U.S. 19, 39–40, 67 S.Ct. 1658, 1668–1669, 91 L.Ed. 1889 (1947).

tional Forest, to Barter's attorney explains the Forest Service position: [4]

> The Forest Service acknowledges Mr. Barter's right to explore for and extract the minerals included in the above mentioned mineral reservation. We do not agree that limestone is included in the definition of minerals as contained in the Purcell and Wiedemann reservations. Therefore, Mr. Barter can explore for minerals such as coal, oil, gas and fluorspar, but not specifically for limestone.

Despite Barter's knowledge that the Forest Service contested his right to quarry limestone, and with full knowledge that any exercise of the mineral rights would require prior approval of the Forest Service, Downstate entered into a lease for quarrying equipment with a monthly rental of $90,000 beginning September 15, 1980. Shortly thereafter, Downstate sought to commence clearing a 200′ × 1000′ strip of forest located on the Purcell tract as a stock-piling area for limestone. On September 26, 1980, Downstate representatives met with a number of Forest Service personnel to discuss this contemplated clearing operation and to present the Forest Service with the Initial Draft Environmental Assessment Report pertaining to the proposed limestone quarrying. Downstate did not receive permission to proceed with the contemplated clearing operation. Consequently, Downstate presented the Forest Service with a written ultimatum [5] that if the Forest Service did not approve the proposed clearing operation by 5:00 p. m. on that day, later extended to September 29, 1980, then Downstate would proceed to clear the area as it deemed appropriate.

In a letter dated September 29, 1980, Forest Supervisor Jolly responded to Downstate's ultimatum and informed Downstate "that a decision on your request will not be rendered by the date and time set out in your letter, specifically, 5:00 p. m., September 29, 1980. The need for independent agency examination and determination of environmental factors associated with such a stockpiling site alone requires more time than you have allotted in your request." The letter continued with the following admonition: [6]

> You, your agents and employees are also hereby advised that the location of such a site on National Forest land without approval is a violation of the provisions of 36 CFR 261.10(a) and punishable in accordance with the sanctions set out in 16 USC 551. Criminal citations will be issued to violators. Continued violations after citation may result in arrest. Timber removed or trees cut in the unapproved location of such a site may also be punishable under the provisions of 18 USC 1852, 1853.

This quiet title action was filed by Downstate on October 6, 1980 in the United States District Court for the Southern District of Illinois against the United States pursuant to 28 U.S.C. § 2409a and 28 U.S.C. § 1346(f). Downstate immediately moved for a preliminary injunction enjoining the United States and its officers or employees "during the pendancy [sic] of this action from prosecuting either Downstate or its officers, employees or agents under 36 CFR 261.10(a), 16 U.S.C. § 551, or 18 U.S.C. §§ 1852–53." A hearing was held on Downstate's motion on October 8, 1980 be-

---

4. The September 3 letter also stated that "the general assurances received to date from Mr. Barter are not sufficient for adjudicating the degree of compliance with the other conditions." Therefore, the letter called for Barter to supply more specific information in order to assure compliance with several specified conditions precedent to mining for minerals other than limestone.

5. Barter himself described the September 26 letter to the Forest Service as an "ultimatum". Transcript, Oct. 8, 1980, at 35.

6. The letter concluded with the following plea for a peaceful resolution of the dispute:

> Hopefully, this matter will not now proceed to any type of unapproved, on-the-ground disturbance of the National Forest land involved. We understand that the legal issues associated with mineral interest [sic] and the limestone located on the property are being framed by our respective attorneys for judicial review in the very near future. To refrain from unapproved site location or surface disturbance at this point would be both prudent and rational.

fore Chief Judge Foreman. On October 15, 1980, Chief Judge Foreman granted the preliminary injunction and,

enjoin[ed] defendants United States of America, United States Department of Justice, United States Department of Agriculture, United States Department of Agriculture Forest Service, and their employees, servants, agents or those acting in concert with them, during the pendency of this action, and until otherwise ordered by this Court, from prosecuting either Downstate Stone Company or any of its officers, employees or agents under 36 C.F.R. 261.10(a), 16 U.S.C. § 551 or 18 U.S.C. §§ 1852 thru 53, for acts done in conjunction with its mining operations on the subject premises.

*Downstate Stone Co. v. United States*, No. 80–4456, slip op. at 5 (S.D.Ill. Oct. 15, 1980).[7]

Downstate subsequently cleared seven acres of the Purcell tract without Forest Service approval. The United States appealed to this Court, and we now reverse and vacate the district court's grant of a preliminary injunction.

## II

The district court has broad discretion to determine whether the applicable standards justifying the grant of a preliminary injunction have been satisfied. In reviewing the grant or denial of a preliminary injunction, we will reverse the district court only if there is a clear showing that, in light of the applicable standards, the district court's action constituted an abuse of discretion. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975); *O'Connor v. Board of Education*, 645 F.2d 578 at 580 (7th Cir. 1981).

### A

We question first the propriety of an injunction enjoining enforcement of concededly valid and constitutional federal criminal statutes designed to police compliance with valid and applicable Forest Service rules and regulations. Courts repeatedly have recognized the very heavy presumption against enjoining pending or threatened criminal prosecutions. "The general rule is that equity will not interfere to prevent the enforcement of a criminal statute even though unconstitutional . . . . To justify such interference there must be exceptional circumstances and a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights . . . ." *Spielman Motor Sales Co., Inc. v. Dodge*, 295 U.S. 89, 95, 55 S.Ct. 678, 680, 79 L.Ed. 1322 (1935) (citations omitted). *See Ivy v. Katzenbach*, 351 F.2d 32, 34–35 (7th Cir.), *cert. denied*, 382 U.S. 958, 86 S.Ct. 437, 15 L.Ed.2d 732 (1965).

There are some recognized exceptions justifying a preliminary injunction against enforcement of a criminal statute. *See, e. g., Hynes v. Grimes Packing Co.*, 337 U.S. 86, 98–99, 69 S.Ct. 968, 976–977, 93 L.Ed. 1231 (1949) (injunction permissible against

---

7. The court also stated that,

It Is Further Ordered that defendants shall not unreasonably or arbitrarily withhold approval of the location of all buildings, camps, roads, bridges and other structures necessary in carrying on plaintiff's mining operations. *Downstate Stone Co. v. United States*, No. 80–4456, slip op. at 5 (S.D.Ill. Oct. 15, 1980).

The regulation and statutes, the enforcement of which were enjoined, provide in pertinent part as follows:

36 C.F.R. 261.10:

The following are prohibited:

(a) Constructing, placing, or maintaining any kind of road, trail structure, fence, enclosure, communication equipment, or other improvement without a permit.

16 U.S.C. § 551:

The Secretary of Agriculture shall make provisions for the protection against destruction by fire and deprivations upon the public forests and national forests . . .; and any violation of . . . such rules and regulations shall be punished by a fine of not more than $500 or imprisonment for not more than six months, or both . . . .

18 U.S.C. § 1852:

Whoever cuts, or wantonly destroys any timber growing on the public lands of the United States; . . . Shall be fined not more than $1,000 or imprisoned not more than one year, or both.

18 U.S.C. § 1853:

Whoever unlawfully cuts, or wantonly injures or destroys any tree growing, standing, or being upon any land of the United States . . . shall be fined not more than $1,000 or imprisoned not more than one year, or both.

enforcement of allegedly invalid federal regulations that would deprive plaintiffs of property rights); *Philadelphia Co. v. Stimson*, 223 U.S. 605, 620–22, 32 S.Ct. 340, 344–45, 56 L.Ed. 570 (1912) (injunction against enforcement of criminal statute permissible where statute allegedly is unconstitutional and officer is exceeding or abusing his authority); and *Dobbins v. Los Angeles*, 195 U.S. 223, 241, 25 S.Ct. 18, 22, 49 L.Ed. 169 (1904) (injunction permissible to "restrain the arbitrary and discriminatory exercise of the police power which amounts to a taking of property without due process of law and an impairment of property rights protected by the Fourteenth Amendment . . . .").

■ But Downstate's situation does not fit within any of the recognized exceptions justifying enjoining enforcement of a criminal statute. First, Downstate does not challenge the constitutionality, validity, or applicability of the Forest Service rules and regulations listed in the Purcell and Wiedemann deeds or of the criminal statutes which incorporate those rules and regulations and are intended to ensure compliance with the rules and regulations. Downstate repeatedly has conceded that it is subject to Forest Service regulations regarding surface disturbances pursuant to valid mining claims and that prior Forest Service approval is necessary for any actions interfering with the natural state of national forest lands.[8] Consequently, the preliminary injunction is not justified as a measure necessary to protect against enforcement of an invalid or unconstitutional statute.

Second, in most cases where an injunction against enforcement of a criminal law is granted, the threatened criminal prosecution would merely relitigate the primary issues presented in the pending civil action. In the present case, however, a criminal prosecution for failure to comply with the applicable Forest Service regulations would not involve the same issues presented in Downstate's pending quiet title action. The sole issue in the pending civil case is whether limestone is within the scope of the Purcell and Wiedemann mineral rights reservations. Downstate's compliance with the Forest Service rules and regulations recognized in the deeds as conditions to any mineral exploration or mining is a wholly unrelated issue. Downstate's compliance would be an issue in either a criminal prosecution for unauthorized destruction of national forest lands or in an administrative or judicial challenge to the Forest Service's interpretation and application of its regulations. Consequently, regardless of the outcome of Downstate's quiet title action, Downstate still must comply with applicable Forest Service regulations, and Downstate should remain subject to criminal or civil injunctive action for failure to comply.

Finally, Downstate asserts, in a very conclusory manner, that the government's threat of criminal prosecution if Downstate attempts to exercise its rights under the mineral reservations constitutes arbitrary action that denied Downstate the proper use of its property. We find this argument specious and misleading. We find that the government's warning to Downstate that it would proceed under criminal statutes in order to ensure compliance with applicable Forest Service regulations, rather than to immediately institute a civil action to enjoin Downstate from undertaking the contemplated unilateral conduct, does not constitute arbitrary conduct or an abuse of power by the government. The government responded reasonably to Downstate's arrogant ultimatum that the Forest Service must approve Downstate's clearance request immediately or Downstate would take unilateral action clearly in violation of the applicable deed conditions and Forest Service regulations. The government's September 29 letter correctly informed Downstate of the legal ramifications of such illegal conduct. Moreover, the letter clearly urged all parties to exercise restraint and to resolve the issue peacefully through appropriate civil proceedings. Without some showing of improper animus, the government's decision to rely on valid criminal

8. We must note, however, that Downstate's ultimatum to the Forest Service and the subsequent clearing of seven acres of land without Forest Service approval is inconsistent with Downstate's repeated concessions that it is bound by the conditions contained in the deeds.

statutes was merely a choice of remedies intended to enhance enforcement of valid rules and regulations. The burden is not upon the government to institute civil proceedings to resolve each and every dispute that might lead to a criminal prosecution.

We acknowledge that, in practical terms, the government holds the upper hand over Downstate; it retains possession and control of the land and the authority to approve or disapprove the conduct of mining operations. But, such a superior government position seems justified when the underlying issue concerns the preservation, conservation, and use of precious natural resources held in trust for present and future generations of Americans. Furthermore, commercial developers such as Downstate are not powerless to challenge the government's position. Downstate is free to challenge, through administrative or judicial means, the government's interpretation of the scope of the mineral reservations or its interpretation and application of Forest Service regulations. The underlying quiet title action is such an appropriate means for resolving the disputed mineral reservation. But bold threats, such as Downstate's September 26 ultimatum, are wholly inappropriate and should be condemned. Although private parties may disagree, perhaps even vehemently, with government action, they are not free to flout valid laws with impunity. Nor should courts aid parties to do so by enjoining enforcement of criminal statutes intended to protect the integrity of administrative regulations and processes and to protect our national forests. The government's response in this case certainly is not an impermissible exercise of authority.

Even assuming that the government's conduct was impermissible, we fail to see how the threatened enforcement of the criminal statutes and Forest Service regulations could deprive Downstate of any valid property rights. In the deeds, Downstate's property rights are explicitly conditioned on securing Forest Service approval prior to disturbing government lands. The Forest Service repeatedly informed Downstate of the need to secure prior approval, and Downstate repeatedly acknowledged its obligation to do so. Consequently, enforcement of criminal statutes for failure to secure such approval does not interfere with Downstate's lawful use of property. Downstate could exercise its property rights only in compliance with the deed conditions. Moreover, the threat of enforcement during the pendency of the quiet title action does not deny Downstate any protected right to the interim use of the property as it sees fit. The deeds require compliance with Forest Service regulations regardless of the outcome of the quiet title action. And, Downstate does not have a right to exploit the national forest lands during the pendency of the quiet title action, except as the Forest Service specifically approves. *See* discussion of 28 U.S.C. § 2409a(b), *infra*, Part II–C.

## B

██ Having stressed that an injunction against enforcement of valid statutes and regulations is of questionable propriety under the facts of this case, we now examine whether even the normal standards for a preliminary injunction have been satisfied.

The standards for granting a preliminary injunction are well established in this Circuit. The district court must consider each of the following four factors:

(1) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue;

(2) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant;

(3) whether the plaintiff has at least a reasonable likelihood of success on the merits; and

(4) whether the granting of a preliminary injunction will disserve the public interest.

*O'Connor v. Board of Education,* at 580 (7th Cir. 1981), *quoting Reinders Bros. v. Rain Bird Eastern Sales Corp.,* 627 F.2d 44, 48–49 (7th Cir. 1980). In exercising its discretion whether to grant an injunction, the court should keep in mind that "[t]he purpose of a preliminary injunction is to preserve the

status quo." *O'Connor*, at 582, *citing E.E. O.C. v. City of Janesville*, 630 F.2d 1254, 1259 (7th Cir. 1980).

The district court apparently concluded that Downstate had established a strong probability of success on the merits of its quiet title action and then, applying a somewhat relaxed standard for weighing the relative harm in granting or denying the injunction, concluded that Downstate would suffer irreparable harm and that the balance of equities rested with Downstate. We disagree with several of the district court's conclusions.

**1**

Although we do not wish to belabor the point, our cursory review of the issues suggests that Downstate's success on the merits of its quiet title action is not a foregone conclusion. *See Kinder v. LaSalle County Carbon Coal Co.*, 310 Ill. 126, 141 N.E. 537 (1923) (interpretation of mineral reservation requires examination of facts, circumstances, and intent surrounding reservation); and *Allendorf v. Daily*, 6 Ill.2d 577, 590–91, 129 N.E.2d 673, 680 (1955) ("Deeds should be construed most favorably to the grantee and the intention of the parties is the test by which to determine the effect of a deed . . .").

**2**

Downstate has failed to establish that, in the absence of a preliminary injunction against enforcement of these criminal statutes, it will suffer irreparable harm. Downstate's claim that it will suffer irreparable harm is based on the following allegations: 1) without the preliminary injunction effectively permitting immediate development, Downstate will be irreparably delayed in exploiting the limestone deposits before its mineral reservations expire in 1985; 2) the Cave Hill limestone deposit is a unique deposit and alternative sources would necessitate significantly higher transportation charges for delivering the limestone to markets in the Saline County area surrounding the Cave Hill deposits; and 3) Downstate must pay $90,000 per month for leasing quarry equipment that is useless if it cannot exploit the limestone deposits immediately.

Initially, we emphasize that, except in exceptional circumstances not present here, delay and consequent expenses or loss of profits incurred because necessary government approval is not immediately forthcoming do not constitute irreparable harm. *See A. O. Smith v. F. T. C.*, 417 F.Supp. 1068, 1077 (D.Del.1976) (greater burden of complying with agency requirements pending resolution of legal challenge does not constitute irreparable harm). Furthermore, the facts here do not support Downstate's claims of irreparable harm.

First, the 1985 expiration of the mineral reservation applies only to the Purcell tract, yet the injunction sweeps broadly across all of the lands involved in this dispute. In addition, Downstate failed to adduce any evidence that a delay in commencing operations on the Purcell tract, until the quiet title dispute is resolved and compliance with Forest Service regulations is assured, would render it impossible for Downstate to commercially exploit and exhaust the Purcell limestone deposits prior to the 1985 expiration of the mineral rights reservation. Consequently, we are left to sheer speculation regarding any actual loss of profits as a result of a delay in commencing operations.

Second, although the record establishes that the Cave Hill limestone deposits are of very high quality, Barter testified at the hearing below, and Downstate's counsel conceded at oral argument before this Court, that there are other deposits of limestone of comparable quality within the general area of southern Illinois. Downstate, however, argues that increased transportation costs would be incurred in developing and marketing these alternative limestone deposits. But, Downstate failed to produce any evidence that its inability to immediately exploit the Cave Hill deposits would place it at a competitive disadvantage vis-a-vis other limestone producers. Thus, we are not persuaded that the increased costs associated with developing alternative limestone sources constitutes irreparable harm justifying this drastic injunctive relief.

Third, Downstate's claimed loss of $90,-000 per month since September 15, 1980

because it cannot use the leased quarrying equipment does not constitute irreparable harm in this case. Downstate entered into the equipment lease with full knowledge that the government contested the scope of the mineral reservations, that prior Forest Service approval was necessary to exercise the mining rights, and that such approval may take six months or more to receive. Under such circumstances, we cannot allow Downstate to bootstrap itself into a position of claiming irreparable harm from delay when it was fully aware of the potential for such delay when it incurred the lease obligations.

Finally, denial of the preliminary injunction, i. e., maintenance of the status quo, would be entirely consistent with the Purcell and Wiedemann deeds upon which Downstate must rely in order to assert any rights or interests. Denial of the preliminary injunction would simply have relegated Downstate to its contemplated position of having to comply with Forest Service regulations in order to exercise any rights under the deeds. Denial of the preliminary injunction would have maintained the status quo, rather than giving Downstate carte blanche authority to proceed as it wished without regard to Forest Service regulations or deed restrictions.

### 3

The final factors to be considered are whether the threatened harm to Downstate outweighs the threatened harm the injunction may inflict on the United States and whether the injunction will disserve the public interest. Because the public's interest in wise management of our national forests and the government's responsibility for such management are consistent with each other in this case, we think it appropriate to discuss both factors together.

We begin by stressing the importance of the government's and the public's interest in managing scarce natural resources such as these national forest lands. The public,

Congress, and the Forest Service have recognized the need for thoughtful government approval and supervision of any commercial development on national forest lands. Until such development is duly authorized and approved, and even during actual development, the government possesses a fundamental interest in ensuring that our natural resources are carefully preserved, conserved, or utilized, as appropriate. Continued government control and supervision of national forest lands is essential to the fulfillment of this weighty public interest.

The preliminary injunction granted in this case interferes directly with the public's interest in continued government control and supervision of our national forests. The injunction effectively permits Downstate to undertake commercial development on national forest lands in defiance of clearly applicable Forest Service regulations. Indeed, Downstate took advantage of the injunction's protective umbrella to clear seven acres of national forest land without the requisite Forest Service approval.[9]

Besides interfering with the overriding public interest in continued government control and supervision of national forest lands, the injunction threatened, and resulted in, irreparable harm to these national forest lands. Large scale surface mining operations necessarily result in the destruction of the natural habitat, environment, and geography of the forested lands. Downstate's Initial Draft Environmental Assessment Report acknowledges that "[a] large open quarry area will be left where there was once rocks, trees and soil," and that "[t]he action of mining the rock is irreversible . . . ." The record is clear that Downstate cleared timber and underbrush from large areas of land and contemplated extensive quarrying operations that would leave indelible prints on this forest preserve. The destruction of the natural habitat and the actual mining of limestone is virtually irreversible and certainly constitutes irreparable harm. Although the trees and underbrush may eventually grow back

9. Although the preliminary injunction may protect Downstate from criminal responsibility for this unauthorized destruction of national forest lands, we note that condition Five of the Purcell and Wiedemann deeds states that the United States is entitled to damages for "all timber, undergrowth, and reproduction unnecessarily cut, destroyed, injured, or damaged, . . . ."

and wildlife return to the area, it takes generations to restore the land to its natural state. This certainly constitutes irreparable harm of the greatest magnitude. *See West Virginia Highlands Conservancy v. Island Creek Coal Co.*, 441 F.2d 232, 236 (4th Cir. 1971).

Downstate argues that the potential economic benefits of this quarry operation offset any harm to the public interest incurred as a result of immediate development. Downstate presented evidence that the quarrying operation would create 25 or more much needed jobs and that the production of limestone at this site could save the Saline County Highway Department up to $100,000 each year in reduced costs for road construction materials. Although these economic benefits may be desirable, we cannot conclude that they offset the irreparable harm done to the environment and to the public interest in wise management of our natural resources. Refusal to grant the injunction would mean, at most, a delay in the development of the quarry and the enjoyment of these economic benefits. On the other hand, granting the injunction threatened irreparable harm to these national forest lands.

## C

 Finally, the injunction granted by the district court is contrary to the mandate of 28 U.S.C. § 2409a(b) [10] which states that during the pendency of a quiet title action brought against the United States pursuant to 18 U.S.C. § 2409a(a), control and possession of the contested property remains with the United States.[11] As we have repeatedly stated, the injunction granted here seriously undermines the ability of the United States to enforce the Forest Service rules and regulations that are concededly applicable. This injunction, in essence, transfers control of the development of these national forest lands from the government to Downstate. Such a transfer of control is squarely counter to the requirement in § 2409a(b) that control and possession remain with the United States.

Moreover, the injunction, which permits exploitation of these lands prior to final resolution of the quiet title action, undermines the government's right under § 2409a(b) to retain the properties upon payment of just compensation should Downstate succeed on the merits. If Downstate is permitted to exploit the mineral reservation during the pendency of the quiet title action, there may well be little of economic or environmental value left for the government to purchase. Continued government control and possession is essential in order to preserve the government's option to retain the property intact upon the payment of just compensation.

**10.** 28 U.S.C. § 2409a(b) states that:

The United States shall not be disturbed in possession or control of any real property involved in any action under this section pending a final judgment or decree, the conclusion of any appeal therefrom, and sixty days; and if the final determination shall be adverse to the United States, the United States nevertheless may retain such possession or control of the real property or of any part thereof as it may elect, upon payment to the person determined to be entitled thereto of an amount which upon such election the district court in the same action shall determine to be just compensation for such possession or control.

**11.** Downstate argues that this Court should not consider any arguments based on 28 U.S.C. § 2409a(b) since that portion of the statute was not argued by the government in the district court. Downstate contends that the government's failure to raise the issue below either constitutes a waiver of the statutory limitation or bars this Court from considering the issue. *See Stern v. United States Gypsum, Inc.*, 547 F.2d 1329, 1333 (7th Cir.), *cert. denied*, 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977).

We disagree with Downstate's reasoning. First, nothing in the record or in Downstate's argument supports the assertion that the United States knowingly waived this statutory limitation on quiet title actions. Second, it is clear that the complete statute was before the district court and should have been considered by the court. Downstate's quiet title action is premised on subsection (a) of 28 U.S.C. § 2409a; it forms the jurisdictional basis and waiver of sovereign immunity for plaintiff's action. Downstate cannot rely on subsection (a) to confer jurisdiction, but expect this Court to ignore subsection (b)'s limitations on actions brought under subsection (a). The applicability of § 2409a(b) was addressed by the parties on this appeal, and, in the interest of justice, we proceed to consider it.

## III

For the foregoing reasons, we hold that it was error and an abuse of discretion for the district court to grant the preliminary injunction enjoining the United States from enforcing the criminal statutes intended to enforce compliance with applicable Forest Service rules and regulations.[12] The district court's judgment granting the preliminary injunction is reversed and the injunction is vacated. Mandate shall issue immediately and costs shall be borne by Downstate.

NICHOLS, Judge, concurring:

I concur in the opinion and the judgment. However, I feel constrained to state my view that the point made in Part C really subsumes all the rest, egregious as are the other errors in the decision below. 28 U.S.C. § 2409a is a waiver of the sovereign immunity of the United States and a consent to suits in the U. S. District Courts to resolve title disputes in which the United States may be embroiled. Previously, the only remedy was by suit on a taking theory under 28 U.S.C. § 1491 in the Court of Claims. *See Bourgeois v. United States*, 212 Ct.Cl. 32, 545 F.2d 727 (1976), and the government still denied that the taking theory was validly applied in that context. The new provision was sought by the government largely with the hope of obtaining the option, if the claimant won, of accepting the property in issue, and paying for it, or rejecting it, whereas under 28 U.S.C. § 1491 the government, losing, found itself the owner willy-nilly, obliged willy-nilly to pay just compensation. A waiver of sovereign immunity and consent to be sued must be construed strictly and cannot be extended by implication, *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. Jones*, 131 U.S. 1, 9 S.Ct. 669, 33 L.Ed. 90 (1889). The reservation to the government of pos-

session and control during the course of the litigation is clearly a limitation on the consent to be sued, which the district court lacks jurisdiction to override. That it did undertake so to override was, therefore, an *ultra vires* act, that could not be made more so by being erroneous, as it was, on other grounds also. A court cannot have less jurisdiction than none at all.

---

12. Our decision applies with equal force to that portion of the district court's judgment restraining the United States from unreasonably or arbitrarily withholding approval of Downstate's mining operations. There was no evidence that the Forest Service had withheld, or had threatened to withhold, approval on imper-

missible grounds. This portion of the injunction is unnecessary and overly broad, and is vacated along with the rest of the injunction. Downstate has sufficient legal means to challenge any specific government conduct it considers unreasonable or arbitrary.