ELKO COUNTY BOARD OF SUPERVISORS; Duval Ranching Company; S & D Company; Kirk and Ramona Dahl; Sandra L. Sharp; and Sandra L. Sharp and Randall Sharp as trustees of the Leslie B. Sharp Testamentary Trust, Plaintiffs,

v.

Daniel R. GLICKMAN, Secretary of Agriculture; Jack Ward Thomas, Chief, United States Forest Service; R.M. "Jim" Nelson, Acting Forest Supervisor, Humboldt National Forest; D. Waive Stager, Acting District Ranger, Ruby Mountains Ranger District, Humboldt National Forest; United States Forest Service; and United States, Defendants.

No. CV–N–95–38–ECR.

United States District Court,
D. Nevada.

Nov. 17, 1995.

John E. Marvel, Special Counsel to the Board of Commissioners of Elko County, Nevada, Elko, NV, Susan E. Buxton, Moore & McFadden, Boise, ID, for Plaintiffs.

Shirley Smith, Asst. U.S. Atty., Reno, NV, Stephen G. Bartell, Environmental Defense Section, Environment & Natural Resources Division, United States Department of Justice, Washington, DC, for Defendants.

## ORDER

EDWARD C. REED, Jr., Senior District Judge.

This is a dispute about water, and the irrigation ditches which carry it out of a national forest and onto private land. The plaintiffs are ranchers in the Ruby Valley, in Elko County in northeastern Nevada. Their land lies, roughly speaking, immediately west of, and downhill from, the Humboldt National Forest. The defendants are the United States, its Forest Service, and the federal officials responsible, in varying degrees, for supervising use of that Forest.[1]

1. Daniel R. Glickman is now the Secretary of Agriculture and is automatically substituted in place of his predecessor in office, Michael Espy. *See* Fed.R.Civ.P. 25(d)(1). All the federal officers

The prime sources of water in the area are natural springs located in the Humboldt Forest. The water from those springs has been diverted toward the ranchers' land, where it is used primarily for irrigation and stockwatering purposes, by means of ditches which run across Forest Service land. The ranchers explain that, because their predecessors in interest built the ditches and diverted the water over a century ago, long before the federal land at issue was withdrawn from the public domain and made part of a national forest, they have the right to enter onto Forest Service land to maintain and improve the ditches, and vested rights to the water conveyed by them.

Hence this dispute. The ranchers claim that the Forest Service has interfered with their rights by placing fill on, and breaching, an irrigation ditch; by demanding, for the first time, that they prove the existence and extent of their rights before they enter onto Forest Service land to clean and maintain the ditches; and by prosecuting them, or threatening to, for cleaning and maintaining their irrigation ditches in a manner which they claim is minor and routine, and therefore within the scope of their rights. They ask for a preliminary injunction against the Forest Service, barring such "interference" with their rights.

The Forest Service opposes the motion. None of its employees, it states, has ever filled in, or breached, an irrigation ditch. It acts properly, it claims, when it requires the ranchers to prove that they do have rights under the relevant federal statute, before they enter onto Forest Service land to do various things in exercise of those rights. And, the Forest Service argues, even if the ranchers do have vested rights, certainly it

may prosecute them if their activities on Forest Service land fall outside the scope of those rights and are not otherwise permitted by the relevant federal regulations. The briefing is complete. *See* Docs. # 12, 21 & 27.[2]

## I. *The facts*

The general area at issue is referred to by the ranchers as the Woolverton Basin, Doc. # 1 ¶ 25, and consists of four separate drainages: Woolverton, Rockslide, Ray, and an unnamed drainage. *Id.*[3] Four springs—Kelly, Woolverton, House and Ray—originate in the Humboldt National Forest in this area, in what the ranchers term "close proximity" to their own land. *Id.* ¶ 24.

### A. *Kelly Spring*

The upper portion of the Rockslide drainage is managed by the Forest Service, while the lower portion is owned by the Duvals. *Id.* ¶ 36. Both House Spring and Kelly Spring originate in the Rockslide drainage. *Id.* ¶ 35. A defined drainage begins at Kelly Spring. *Id.* ¶ 38. About a half mile below the spring is an impoundment structure, and about 100 yards below that structure is an irrigation ditch which delivers water to the Duval Ranch. *Id.*

In the summer of 1992, Don Duval installed a collection box, pipeline, trough and overflow at Kelly Spring. *Id.* ¶ 39. The precise details are unclear, but Duval himself states that he installed a "buried water line," Doc. # 1 Exh. E ¶ 9, running across national forest land, Doc. # 21 at 10, "from Kelly Spring approximately 100 yards due west to a livestock water trough on Duval Ranching Com-

are sued in their official capacities, Doc. # 1 ¶¶ 18–21, and for simplicity we refer to all defendants collectively as the "Forest Service."

2. We held oral argument, at which we questioned whether the Elko County Board of Supervisors had standing to participate in this lawsuit. At the plaintiffs' request, we allowed supplemental briefing on that question, which is now complete. *See* Docs. # 36, 37, 38 & 39. The briefing is lengthy and the issue of the County's standing complex; we will address it in a separate order to be issued in the near future.

3. A rough map of the area is attached as Exhibit B to the ranchers' complaint. It should be emphasized that the factual description of the area is taken from the complaint. Doc. # 1. The Forest Service does not concede the accuracy of that description, *see* Doc. # 5, and we make no finding with respect to it. As a general matter, we refer throughout this order to the allegations in the complaint, rather than to the narrative in the ranchers' motion for an injunction, because the former is more detailed. The affidavits and exhibits submitted with each document are largely the same.

pany's private ground." Doc. # 1 Exh. E ¶ 9.

Duval was charged with two misdemeanors, for damaging a natural feature of the United States, 36 C.F.R. § 261.9(a), and for placing a structure on national forest land without approval from the Forest Service. 36 C.F.R. § 261.10(a). He pled guilty before a federal magistrate in January 1994, and was fined, *id.*, and ordered to restore the site to its original condition. Doc. # 21 Exh. 7. Duval began the restoration work, but never completed it: in early October 1994, according to the Forest Service, a group of unidentified citizens installed a new water collection box, which is currently in place, at Kelly Spring. Doc. # 21 at 12–13.

### B. *Woolverton Spring*

The upper portion of the Woolverton drainage is public land, managed by the Forest Service. The lower portion is owned by the Duval Ranching Company and the S & D Company. Doc. # 1 ¶ 27. Woolverton Spring originates in this drainage. According to the ranchers, its waters flow for about three-quarters of a mile in their original channel, and are then diverted across national forest land to Kirk Dahl's ranch, by means of an irrigation ditch about 1.75 miles long. *Id.* ¶¶ 28, 29. The ditch runs on Forest Service land for about a quarter of a mile before crossing onto Dahl's land.[4] *Id.* Exh. D ¶ 11.

Dahl and his wife have owned their ranch for over forty years and claim a water right dating back to 1875. *Id.* ¶¶ 2, 6. About five years ago, according to the ranchers and Dahl, *see* Doc. # 1 ¶ 30 & Exh. D ¶ 8, the Forest Service fenced off about 5.5 acres around Woolverton Spring in order to create or protect a riparian area. At the same time, the ranchers allege, "the Forest Service

brought in heavy equipment and proceeded to cover" with fill material an area about 100 by 150 feet around the spring. Doc. # 1 ¶ 30. Finally, Dahl alleges, the quarter mile stretch of the irrigation ditch which runs on Forest Service land "has periodically been damaged by third parties," Doc. # 1 Exh. D ¶ 11, whom Dahl believes to be "Forest Service personnel or agents." *Id.* Specifically, Dahl explains that "[t]he ditch bank has been cut out allowing the water to flow back to the natural channel," and "tree branches and other debris" have been placed in the ditch, causing the water in the ditch to flow over the bank. *Id.*

### C. *Ray Spring*

The bulk of the Ray drainage is public land; the lower quarter of the drainage is privately owned. Doc. # 1 ¶ 41. Sandra Sharp, both individually and as a trustee, owns the Sharp Angus Ranch, *id.* Exh. G ¶ 2, and she claims that the Ranch owns vested water rights, to Ray Spring, *id.* ¶ 3, dating back to 1889. *Id.* ¶ 7. A natural channel runs through the drainage, intermittently above the spring and perennially below it. Doc. # 1 ¶ 42. Towards the lower, western end of the drainage is a diversion dam. From the dam, an irrigation ditch runs about a half mile until it reaches a road. *Id.* ¶ 44.[5]

Ray Spring was, according to the ranchers, dug out in the past with a drag line or similar device, *id.* ¶ 46, and they theorize that the clay base was fractured. In any event, the spring no longer produces water. But whatever caused the problem, the ranchers explain, water can still be obtained from the spring so long as it is routinely cleaned and maintained. *Id.* Don Duval cleared the spring in May 1992, but, he claims, Doc. # 1 Exh. E ¶ 21, was told by Forest Service personnel that the next time he did so he

---

**4.** As noted above, the ranchers allege that the Duvals own the lower portion of the Woolverton drainage. The relative locations of the Duval and Dahl properties is unclear. Also, the ranchers allege that "[t]he right-of-way from the spring to [the Dahls'] private property is approximately .8 miles long." Doc. # 21 at 8. Perhaps that distance includes both the distance the Woolverton Spring waters initially flow in their natural channel (about three-quarters of a mile) and the approximately one-quarter mile segment of the

irrigation ditch which lies on Forest Service land. In any event, we pass over these ambiguities for the moment.

**5.** Sharp, however, states that the distance from the spring itself to her property line is only about 150 yards. Doc. # 1 Exh. G ¶ 11. Whether this is contradicts the allegation in the complaint need not concern us at this point.

would face criminal charges. Similarly, Sandra Sharp claims that, in October 1992, she proposed installation of a pipeline and trough, *id.* Exh. G ¶ 11, which would have run across public land for about 200 feet, *id.* ¶ 12, but could not go forward with the project because the Forest Service refused to allow it.

## II. *The law*

The ranchers base their claim on Section 9 of the Act of July 26 1866. It provided that when

> rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of the courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed....

Act of July 26, 1866, ch. 262, § 9, 14 Stat. 251, 253 (codified at R.S. § 2339, recodified at 43 U.S.C. § 661). More than a century ago, the ranchers explain, when the land which is now part of the Humboldt National Forest was merely land in the public domain, their predecessors diverted water from public land onto their own land. That appropriation, they explain, was sufficient to give them vested rights to the water under Nevada law. Section 9 of the 1866 Act, they continue, recognized both those vested rights and an accompanying right-of-way for a ditch or canal to convey the water across the public domain. Their right-of-way, they conclude, amounts to an easement across the forest land, and such an easement right, which is defined by reference to Nevada common law, includes the right to clean, maintain, and improve the right-of-way.

Section 661 was one of a "tangled array of laws granting rights-of-way across federal lands," *United States v. Jenks,* 22 F.3d 1513, 1515 (10th Cir.1994), repealed in 1976 with the enactment of the Federal Land Policy and Management Act ("FLPMA"). 43 U.S.C. §§ 1701–84. No new rights to water, and to accompanying rights-of-way, can arise

under § 661. But, as the ranchers point out, rights under § 661 which existed on October 21, 1976, the effective date of FLPMA, were not affected by that statute. FLPMA itself provides that it shall not "have the effect of terminating any right-of-way or right-of-use heretofore issued, granted, or permitted." 43 U.S.C. § 1769(a).

## III. *The Forest Service's regulatory authority and the ranchers' administrative remedies*

We will assume—without deciding—that the ranchers do, in fact, have vested rights to water, and to ditch rights-of-way, under the 1866 Act. Clearly the ranchers are correct when they argue that the scope of any easement right under the 1866 statute is determined by reference to state law. *See Jennison v. Kirk,* 98 U.S. 453, 25 L.Ed. 240 (1878). And we note, again, that all the ranchers want to do, they insist, is normal cleaning, maintenance and development on their rights-of-way—activities which are within their rights under the 1866 statute and which therefore do not require a special use permit. Further, they argue, both federal and state law, and the Forest Service manual, require that the Forest Service follow its own internal rules and allow them to maintain their water sources and ditches.

The ranchers' argument, we think, contains two elements. The first, implicit in their briefing and made expressly at oral argument, is that they are simply not subject to regulation by the Forest Service, because everything they want to do is within the scope of their 1866 easements across national forest lands. Doc. # 27 at 4, 26. The second, made in a much more summary fashion, is that, even if they are subject to some sort of supervision by the Forest Service, that agency is acting illegally, and they are therefore entitled to judicial relief.

### A. *The Forest Service's regulatory authority*

█ The ranchers may have (and, again, for present purposes we assume they have) vested rights to water and to rights-of-way across land within the Humboldt National Forest. As noted above, the scope of any

such easement would, indeed, be determined by reference to the relevant state law, as it existed on October 21, 1976, when FLPMA became effective. And the ranchers are correct when they point out that FLPMA expressly preserved, by a "grandfather" clause, rights which existed as of its effective date under § 661. *See* 43 U.S.C. § 1769(a).[6]

What the ranchers ignore, however, is the fact that their rights-of-way run across *national forest* lands. We assume that FLPMA, for the reasons stated above, does not limit in any way the ranchers' 1866 ditch rights. Entirely apart from FLPMA, however, Congress has delegated to the Secretary of Agriculture the authority make "rules and regulations" (violation of which is a criminal offense) regarding the occupancy and use of the national forests. 16 U.S.C. § 551. That authority is considerable, and includes the right to reasonably regulate the exercise of vested water rights and accompanying rights-of-way obtained under 43 U.S.C. § 661, where such rights and rights-of-way lie within a national forest.[7] *Adams v. United States*, 3 F.3d 1254, 1260 (9th Cir.1993); *Hyrup v. Kleppe*, 406 F.Supp. 214, 216–17 (D.Colo.1976); *see also Nevada Land Action Ass'n v. United States Forest Service*, 8 F.3d 713, 719 & n. 9 (9th Cir.1993) (§ 661 "merely establishes" that ranchers with permits to graze livestock in the national forests "may have protectable rights to the use of water,"

and the Forest Service, with statutory authority to "manage conflicting uses of forest resources," need not consider vested water rights in adopting a management plan for the forests); *Grindstone Butte Project v. Kleppe*, 638 F.2d 100, 103 (9th Cir.1981) (rights under the Act of March 3 1891, like rights under the 1866 Act, are subject to reasonable regulation). The Forest Service has promulgated extensive regulations governing activities on national forest lands. *See* 36 C.F.R. Pts. 251, 261. Those regulations apply to the ranchers just as they do to everyone else.

This answers the ranchers' argument that, so long as they act within the scope of their vested 1866 ditch rights, their actions are not subject to Forest Service regulation, even if they take place on Forest Service land. On the contrary: though we assume that the ranchers have vested rights-of-way under § 661, and that vested rights are protected property interests, a vested right-of-way which runs across Forest Service lands is nevertheless subject to reasonable Forest Service regulation, where "reasonable" regulation is defined as regulation which neither prohibits the ranchers from exercising their vested rights nor limits their exercise of those rights so severely as to amount to a prohibition. *See United States v. Doremus*, 888 F.2d 630, 632 (9th Cir.1989) (*citing Weiss*, 642 F.2d at 299).[8]

---

6. FLPMA does provide that

[t]he Secretary of Agriculture shall have the authority to administer all rights-of-way granted or issued under authority of previous Acts with respect to lands under the jurisdiction of the Secretary of Agriculture, including rights-of-way granted or issued pursuant to authority given to the Secretary of the Interior by such previous Acts[,]

43 U.S.C. § 1761(b)(3), and the Department of the Interior has promulgated extensive regulations pursuant to FLPMA relating to rights-of-way across public lands. *See* 43 C.F.R. Pt. 2800. Those regulations, however, expressly provide that

[a] right-of-way grant issued on or before October 21, 1976, pursuant to then existing statutory authority is covered by the provisions of this part unless administration under this part diminishes or reduces any rights conferred by the grant or the statute under which it was issued, in which event the provisions of the grant or the then existing statute shall apply.

43 C.F.R. § 2801.4.

7. We are keenly aware of the "important and competing interests" involved in this case. Irrigation and stockwatering under the 1866 Act, like mining, "has been accorded a special place in our laws relating to public lands," *United States v. Weiss*, 642 F.2d 296, 299 (9th Cir.1981), and, like mining rights acquired under the 1872 Mining Law, the rights to water, and accompanying rights-of-way recognized by the 1866 Act are vested rights not lightly disturbed. On the other hand, "our national forests have also been a fundamental part of the use of our public lands," *id.*, and the Secretary of Agriculture "has been given the responsibility and the power to maintain and protect our national forests and the lands therein." *Id.*

8. *Doremus* merits further discussion. In that case, two miners had claims in a National Forest, under the 1872 Mining Law. They were cited for, among other things, engaging in a prohibited activity in violation of 36 C.F.R. § 261.9(a). Initially, they argued that, as holders of 1872 mining rights, they were not even subject

## B. *Administrative remedies*

■ With exceptions not relevant here, "[a]ll uses of National Forest System land, improvements, and resources ... are designated 'special uses' and must be approved" by an authorized Forest Service officer. 36 C.F.R. § 251.50(a). "Damaging any natural feature or other property of the United States," or "[c]onstructing, placing, or maintaining any kind of ... structure ... or other improvement on National Forest system land" without a permit, is a criminal offense. 36 C.F.R. §§ 261.1b, 261.9(a), 261.10(a). This means that the ranchers, if they wish to enter onto Forest Service land to perform cleaning and maintenance on the ditches, must get the Forest Service's permission to do so.

It also means that the ranchers, if they are denied permission, must first appeal as far as possible within the Forest Service's administrative structure. The Forest Service's regulations contain an entire subpart, *see* 36 C.F.R. subpart 251, providing for appeals within the Service when an applicant is denied a permit and believes that the decision is incorrect. Moreover, the regulations expressly state, *see* 36 C.F.R. § 251.101, that "it is the position of the Forest Service that, for decisions appealable under the regulations, exhaustion should be required before an aggrieved party may seek federal court review." *Clouser v. Espy*, 42 F.3d 1522, 1532 (9th Cir.1994). Because an "agency rule requires appeal before review," the doctrine of

exhaustion of administrative remedies requires that the ranchers first proceed as far as possible within the Forest Service's own administrative structure. *Id.* at 1532 n. 12; *see also Darby v. Cisneros*, 509 U.S. 137, ——, 113 S.Ct. 2539, 2548, 125 L.Ed.2d 113 (1993).

## IV. *The relief sought*

■ The ranchers want an injunction, barring criminal enforcement, as in Don Duval's case, of the federal regulations found at 36 C.F.R. Part 261 (they believe that civil enforcement mechanisms are the proper route) and stopping what the ranchers term the Forest Service's "interference" with their maintenance, development, and general "use of water rights and accompanying rights-of-way" located on Forest Service land. Doc. # 12 at 1, 6. The "interference" they want enjoined, to reiterate, is said to consist of several discrete acts: placing fill dirt on and around Woolverton Spring, dirt which Kirk Dahl would clear out if he were not afraid of being prosecuted for doing so, *id.* at 8; prosecuting Don Duval for his development of Kelly Spring, and threatening to prosecute him for doing similar work at Ray Spring; and "categorically and arbitrarily," *id.* at 10, refusing to allow Sandra Sharp to develop Ray Spring. *See id.* at 2. It also includes the assertion by the United States, in an ongoing adjudication of all water rights in the Ruby Valley, of water rights inconsistent with those claimed by the ranchers, and the

to that regulation, because 36 C.F.R. § 261.1, which sets out the scope of prohibited activities on national forest lands, specifically exempts from its general prohibition those activities "authorized" by the 1872 Act. 36 C.F.R. § 261.1(b). (The miners might also have cited 36 C.F.R. § 251.50(a), which designates as "special uses" all uses of national forest land *except,* among others, uses provided for in the regulations, 36 C.F.R. Pt. 228, governing operations under the 1872 Mining Law conducted on National Forest System lands.)

The court of appeals disagreed, citing other regulations which referred to mining operating plans as involving prohibited activities, and 16 U.S.C. § 478, which "authorizes entry into national forests for 'all proper and lawful purposes ...'," subject to the condition that " '[s]uch persons must comply with the rules and regulations covering such national forests.' " *Id.* at 632. The court agreed that the miners had a right to

conduct activities "reasonably incident" to their mining rights, but held that "they may not *exercise* that right without first obtaining approval of their operation in the manner specified" in the part of the federal regulations relating to minerals. *Id.* at 633. In context, the court held, § 261.1(b) meant only that the miners' operations " 'may not be prohibited nor so unreasonably circumscribed as to amount to a prohibition.' " *Id.* at 632 (*citing Weiss*, 642 F.2d at 299).

As in *Doremus*, so too here. Indeed, all the more so in this case, given the fact that uses of Forest Service land relating to 1866 ditch rights—unlike uses relating to 1872 mining rights—are neither exempted by 36 C.F.R. § 251.50(a) from the regulations defining "special uses" which require permits, nor excluded from 36 C.F.R. § 261.1(a)'s description of the scope of prohibited activities.

Forest Service's insistence that the ranchers prove the existence and extent of their water rights and ditch rights-of-way before entering Forest Service land to maintain the ditches. *Id.* at 2, 13; *see also* Doc. # 27 at 4.

There are two serious flaws in the ranchers' request for relief. The first is, simply, that they have not exhausted their administrative remedies. There is no indication that any of the ranchers have even applied for permits to perform the maintenance they believe necessary (unless we construe liberally Sandra Sharp's conversation with a Forest Service employee), let alone that they have been denied those permits and appealed the decision within the Forest Service.

The second flaw goes to the very nature of the injunction the ranchers seek: they want us to bar the federal government from bringing criminal prosecutions for violations of the Forest Service's regulations. As noted above, they seek that form of relief expressly, but most of the remainder of their request is to the same effect: Kirk Dahl wants to clear Woolverton Spring, and Don Duval wants to clear Ray Spring, and Sandra Sharp wants to make improvements to Ray Spring, and all want to do so without the threat of criminal prosecution hanging over them. It is clear, then, that what the ranchers seek, though they vaguely term it an injunction against "interference" with their vested rights, is really an injunction against the institution of criminal proceedings against them for violation of Forest Service regulations. They want to enter Forest Service land and do the cleaning and maintenance they believe necessary on their ditches, knowing that they won't be prosecuted for doing so. The inherent problem with that sort of request is that, even if the ranchers had an otherwise meritorious case, we deal here with clearly "valid and constitutional federal criminal statutes designed to police compliance with valid and applicable Forest Service rules and regulations," and therefore recognize the "very heavy presumption against enjoining pending or threatened criminal prosecutions." *Downstate Stone Co. v. United States,* 651 F.2d 1234, 1238 (7th Cir.1981).

## V. *Conclusion*

The standard for issuance of a preliminary injunction in this circuit is familiar. The party seeking the injunction must meet one of two tests. Under the first, he must show that:

(1) he will suffer irreparable injury if the injunction is not granted;

(2) he will probably prevail on the merits;

(3) the State will not be harmed by the injunction more than he is helped by it; and,

(4) granting the injunction is in the public interest.

Under the second, the party must show *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in its favor (though no matter how far the hardships tipped, that party would have to show at least a fair chance of success on the merits). *See Stanley v. University of Southern California,* 13 F.3d 1313, 1319 (9th Cir.1994) (*citing Martin v. International Olympic Committee,* 740 F.2d 670, 674–75 (9th Cir. 1984)).

The ranchers in this case have made no such showing. Even assuming that they have valid 1866 ditch rights and rights-of-way, which constitute vested property rights, those rights-of-way are subject to reasonable regulation by the Forest Service so long as they run across Forest Service land. Among those regulations are the regulations which designate most uses of Forest Service land as "special uses," subject to a permit requirement. The ranchers have not even applied for permits, let alone been denied them and then exhausted their administrative remedies. Moreover, the "interference" with their rights which they seek to enjoin is in substance the threat of prosecution if they enter onto Forest Service land to do the cleaning and maintenance they believe is appropriate, and injunctions against criminal prosecutions are rarely granted.

**IT IS THEREFORE HEREBY ORDERED** that the ranchers' **motion (Doc.**

# 10) for a preliminary injunction is **DE-NIED.**

**IT IS FURTHER ORDERED** that the **clerk** shall amend the caption of this case to delete Michael Espy and substitute in his place Daniel R. Glickman.